UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WDIG MOBILE, LLC, | Index No. _11-Civ-3472____ |
| Petitioner, | |
| – and – | PETITION FOR AN ORDER CONFIRMING ARBITRATION |
| DIGITAL COMMUNICATION WAREHOUSE INCORPORATED, | |
| Respondent. | |

Petitioner WDIG Mobile, LLC ("Disney Mobile" or "Petitioner"), by its attorneys
Schwartz  & Thomashower LLP, for its petition for an order confirming an arbitration award
against respondent Digital Communication Warehouse Incorporated ("DCW") alleges as
follows:

### PRELIMINARY STATEMENT

1.      Disney Mobile seeks an order, pursuant to 9 U.S.C.A. §§ 1, *et seq.* confirming the
June 22, 2010 Final Award (the "Award") issued in the arbitration between petitioner Disney
Mobile and respondent DCW, and directing that judgment be entered for Disney Mobile in the
amount of $903,115.90, exclusive of post-Award interest.  A certified copy of the Award is
annexed as Exhibit A.  A certified copy of the May 2, 2010 Partial Final Award (the "Partial
Award") is annexed hereto as Exhibit B.

### JURISDICTION

2.      This Court has subject matter jurisdiction pursuant to the 9 U.S.C.A § 9, 13 and
28 U.S.C. §1332.  The parties are citizens of different states and the amount in controversy,
exclusive of interest and costs, exceeds $75,000.

3.      DCW consented to personal jurisdiction in the United States Federal Court, Southern District of New York in the October 24, 2006 Equipment Purchase Agreement (the "Agreement") executed by DCW and Disney Mobile.  A copy of the Agreement is annexed hereto as Exhibit C.  Paragraph 19.1 of the Agreement expressly provides that:

> Any civil action based upon, arising out of, or in any manner connected with this Agreement ... shall be commenced in and determined by one of the federal or state courts in the Borough of Manhattan, New York, New York. Each of the Parties to this Agreement (a) irrevocably and unconditionally consents and submits to the in [sic] personal jurisdiction of such courts in any such action ... .

## THE PARTIES

4.      Disney Mobile is a Delaware corporation with offices at 500 South Buena Vista Street, Burbank, California, 91521.  At all relevant times, Disney Mobile was a Mobile Virtual Network Operator that offered, among other things, wireless voice services and entertainment content for use with Disney Mobile-branded or Disney Mobile-approved products, including wireless telephone handsets and accessories (collectively the "Disney Equipment").

5.      DCW is a Pennsylvania corporation, with offices at 6186 Ridge Avenue, Philadelphia, Pennsylvania, 19128.  At all relevant times herein, DCW purchased wireless telephone handsets and accessories for re-sale to mobile service master dealers or directly to retail consumers.

## THE AGREEMENT

6.      In the Agreement, DCW contracted with Disney Mobile on a non-exclusive basis to purchase, sell, and distribute Disney Equipment to authorized Disney Mobile service dealers throughout the United States for use with Disney Mobile's wireless telecommunications service.

7.      Pursuant to the terms of the Agreement, DCW was required to pay for all Disney Equipment it purchased within sixty (60) days of its receipt of the applicable invoice.  All past

due balances were subject to interest charges of one and one half percent (1.5%) per month until paid in full.

8.      Pursuant to the terms of the Agreement, during the period July 19, 2007 through August 10, 2007, Disney Mobile delivered Disney Equipment to DCW in nine separate shipments for a total of $635,375.  Although DCW received the Disney Equipment, it failed to pay for it within sixty (60) days of its receipt of the respective invoices, as required by the Agreement, and in breach of its obligations.

9.      Subsequent to DCW's default, Disney Mobile applied $252,835.50 in applicable offsets and credits to the $635,375 DCW owed Disney Mobile.  As of January 17, 2009, DCW owed Disney Mobile $382,539.50, plus interest at the rate of 1.5% per month.  Pursuant to the terms of the Agreement, DCW had ten (10) days to cure its default and satisfy its payment obligations.  DCW failed and refused to do so.  Therefore, the principal amount of $382,539.50, exclusive of interest, remained due and owing to Disney Mobile from DCW.

## THE ARBITRATION

10.     As set forth in the Award, pursuant to the arbitration provision of the Agreement, the parties submitted the dispute over DCW's obligation to pay for the Disney Equipment it purchased to arbitration at JAMS at its New York City offices.  The parties appointed Michael Young as the arbitrator.

11.     Hearings were held before Arbitrator Young on November 5 and 6, 2009, December 14, 2009 and March 11, 2010, at which both parties appeared and presented substantial testimonial and documentary evidence.  After considering all of the evidence and the parties' pre- and post-hearing submissions, on May 2, 2010, Arbitrator Young issued the Partial Award in Disney Mobile's favor, finding DCW liable for breach of contract, and liable to Disney

Mobile for $382,539.50 in damages.  Disney Mobile was also awarded pre-Award and post-Award interest and reasonable attorneys' fees in an amount to be determined.  In the Partial Award, the Arbitrator directed Disney Mobile to file its fee application and DCW to file any objections.  Partial Award at 17, Exhibit B.

      12.     On June 22, 2010, the Arbitrator issued the Award in Disney Mobile's favor as detailed in the following paragraphs:

          a.     Disney Mobile is awarded the sum of $382,539.50 in damages;

          b.     Disney Mobile is awarded pre-Final Award interest of $183,618.96;

          c.     Disney Mobile is awarded $271,717.86 as reimbursement for the reasonable attorneys' fees incurred in litigating the Arbitration proceeding.

          d.     Disney Mobile is awarded $65,239.58 as reimbursement for the expenses it paid in the litigation of the Arbitration proceeding.  In addition, Disney Mobile is entitled to any additional amount it pays for the JAMS administrative and professional fees for the preparation of the Final Award.

          e.     Disney Mobile is entitled to Post-Final Award interest at 9% per annum to be calculated on a simple basis and applied to the total of the damages and attorneys' fees and costs.  This interest runs from June 23, 2010 until the date of payment.

          f.     Disney Mobile is entitled to a declaration that to the extent DCW sells or otherwise uses the handsets at issue, all of Disney Mobile's intellectual property must be removed.

      13.     Paragraph 19.2(b) of the Agreement expressly provides that "[i]f neither party gives written notice requesting an appeal within thirty (30) days after the issuance of the Statement of Decision, the arbitrator(s)'s decision shall be final and binding as to all matters of

substance and procedure, and may be enforced by a petition to a court of competent jurisdiction, which may be made ex parte, for confirmation and enforcement of the award."  Exhibit C.

14.    At no time since the Award was issued did DCW give notice, written or otherwise, requesting an appeal of the Award.  The Award therefore became final and binding on July 22, 2010.

<u>FIRST CAUSE OF ACTION</u>

(Confirmation of the Award)

15.    Paragraphs 1 through 14 of this Petition are repeated and realleged as if fully set forth herein.

16.    There are no proceedings pending in this or any other court contesting the validity of the Award.

17.    Notwithstanding due demand, DCW has failed and refused to pay Disney Mobile the amount due and owing under the Award.

18.    Accordingly, Disney Mobile is entitled to an order confirming the Award and entry of judgment in Disney Mobile's favor in the amount of $903,115.90 plus post-Final Award interest of 9% per annum calculated from June 23, 2010 until the date of payment.

19.    Pursuant to the terms of the Agreement, Disney Mobile is also entitled to the attorneys' fees and costs it incurs in confirming the Award and enforcing the judgment. Paragraph 19.3, entitled <u>Attorneys' Fees,</u> expressly provides that "[i]n the event an action is commenced by either party to enforce the terms of this Agreement, the substantially prevailing party in such action shall be entitled to its reasonable costs and attorneys' and expert witness' fees incurred therein through appeal."

20.     By reason of the foregoing, Petitioner Disney Mobile requests the following relief:

A.     That an order be made confirming the Award;

B.     That judgment be entered in favor of Disney Mobile and against DCW in the amount of $903,115.90 plus post-Final Award interest of 9% per annum calculated from June 23, 2010 through the date of payment;

C.     That Disney Mobile be awarded its costs and attorneys' fees in confirming the Award and enforcing the judgment; and

D.     That Disney Mobile be awarded other, further, and different relief this Court deems just and proper.

Dated: May 20, 2011
       New York, New York

SCHWARTZ & THOMASHOWER LLP

By: _____
       Rachel Schwartz
       Carla E. Sereny

15 Maiden Lane, Suite 705
New York, New York 10038-5120
(212) 227-4300

*Attorneys for Petitioner*
WDIG MOBILE, LLC

- 6 -

*WDIG Mobile v. Digital Communication Warehouse, Inc.*

# Exhibit A

In the Matter of the Arbitration Between :

WDIG MOBILE, LLC.,                     :

Claimant,                              :          JAMS

                                       :          Reference # 1425002360

vs.                                    :                              :

DIGITAL COMMUNICATIONS                 :

WAREHOUSE, INC.,                       :

Respondent.                            :

                                       :

## FINAL AWARD

I, Michael D. Young, THE UNDERSIGNED ARBITRATOR, having been chosen by the parties to serve as Arbitrator, and having been duly sworn, and having duly heard the allegations and proofs of the parties, do hereby AWARD the following.

### I.    Introduction

On May 2, 2010, the undersigned Arbitrator issued a Partial Final Award ruling that Claimant WDIG Mobile, LLC ("Disney Mobile") is entitled to the sum of $382,539.50 in damages from Respondent Digital Communication Warehouse Incorporated ("DCW"). I also ruled that Disney Mobile is entitled to pre-Award and post-Award interest in an amount to be determined and, pursuant to Section 19.2.c of the governing agreement between the parties, to its reasonable attorneys' fees and costs in litigating this Arbitration proceeding. The Partial Final Award, including its statement of reasons, is expressly incorporated herein.

On May 19, 2010, Disney Mobile filed its application for an award of fees and costs. In this application, Disney Mobile seeks fees in the amount of $366,454.58 and costs in the amount of $64,732.96. (In a supplementary affidavit filed on June 7, 2010, Disney Mobile requests an additional $6300 for the fees incurred in the preparation of the fee application and an additional $497.62 for expenses also incurred in the preparation of the fee application.) In addition, as set forth in the May 19 application, Disney Mobile seeks $176,503.73 in pre-Award interest at the contractual rate of 1.5% per month between

October 22, 2007 and May 2, 2010, the date of the Partial Final Award. Finally, Disney Mobile seeks post-Award interest at the New York statutory rate of 9% per annum on the combined damages and amount awarded for fees and costs, from May 3, 2010 until the date of payment.

On June 2, 2010, DCW filed a half-page objection to the fee request. Citing the amount of time its counsel had spent in the proceeding, and also citing the amount of time billed by the Arbitrator, DCW objects to the number of hours of both outside and in-house counsel for which reimbursement is sought as too many and otherwise unreasonably high. In addition, DCW argues that the time spent by "outside counsel representing Disney Mobile in the California arbitration should not be allowed at all." No other specific objections are made by DCW, nor does DCW object to the use of the contract rate of interest for pre-Award interest purposes. DCW did not file any objection to the fees and expenses claimed by Disney Mobile in the June 7 supplementary request.

Finally, in its May 19 application, Disney Mobile had filed time records with redactions. The Arbitrator requested the full time records so that he could review them *in camera.* Those records have been provided and reviewed.

For the following reasons, the Arbitrator awards in favor of Disney Mobile, in addition to the damages previously awarded, $271,717.86 in attorneys fees, $64,732.96 for costs and expenses (plus any additional amount that it pays for the JAMS administrative and professional fees for the preparation of this Final Award), and $183,618.96 in pre-Final Award interest. Post-Final Award interest is also awarded as requested for the period starting on June 23, 2010 through the date of payment by DCW.

## II.    Analysis of Requests

### A. Attorneys Fees

Disney Mobile seeks reimbursement of the $238,435.58 in fees paid to its primary litigating counsel, Schwartz & Thomashower, including the supplementary claim. This request reflects approximately 800 hours of work that are billed at rates of $400 for one partner, $300 for another partner (the one who served as the primary litigator/trial counsel )and $175 for an associate.

Disney Mobile also seeks reimbursement of $133,374 for work performed by two in-house attorneys. This request reflects approximately 445 hours of work that are billed at a rate of $300. Disney Mobile argues that had this work not been done by in-house counsel, it would have been done by outside litigating counsel.

Based on my review of the application, including the time records submitted in un-redacted form, and based on my observations and knowledge of how both parties conducted the Arbitration proceeding, I find that a reduction of 20% is appropriate to the

fees of outside counsel and a reduction of 40% is appropriate to the fees of in-house counsel. While I find that the rates requested to be reasonable (given the experience and sophistication levels of counsel involved), the number of hours claimed – particularly when the hours of outside and in-house counsel are combined -- is disproportionate to both the amount at stake and the issues that arose. While I acknowledge that DCW litigated the matter very aggressively and raised many issues, both in discovery and on the merits, including some, to use Claimant's words, that were "marginally relevant," a claim for over 1200 hours is just too high. (The foregoing is not intended to be, nor should be construed as being, critical of the quality of the work of Claimant's counsel.)

Moreover, specifically as relates to the work of in-house counsel, case law suggests that these fees are compensable when in-house counsel is actively litigating and when the time claimed is not duplicative of the time spent by outside counsel. The format of the time records kept by outside counsel, while explained in the affidavit which is an exhibit to the May 19 application, does not make it easy to ascertain what time would be compensable. Having reviewed the available records, I am not convinced that all the time claimed constitutes "active litigating" or would be for time that outside counsel would have had to incur had not in-house counsel performed the task. For example, some of the time requested appears to be for "classic" in-house counsel functions, such as review of briefs, which is either duplicative of work performed within the outside law firm or can not be described as an active litigation task. It is also clear that some of the time claimed is for pre-Arbitration proceeding efforts to resolve the matter; it is not at all clear that Section 19.2.c allows for the recovery of these fees. For these reasons, a greater reduction than that applied to outside counsel fees is appropriate.

Finally, the fee request for Thomas Edwards appears to be reasonable and will be allowed.

Accordingly, $190,748.46 of the Schwartz & Thomashower fees is approved, as are $80,024.40 of the in-house counsel fees and $945.00 of the Edwards fees, for a total approved fee amount of $271,717.86.

## B. Costs

DCW did not raise any questions about the expenses that Disney Mobile claims to have incurred and for which it seeks reimbursement.

I have independently reviewed the invoices attached to the application. The costs for which reimbursement is sought appear to have been incurred and appear reasonable. I note that $30,800.07 of the claimed expenses is for Disney Mobile's one-half share of the JAMS administrative and professional fees (through the preparation of this Final Award); I have independently ascertained that these costs were incurred and have been paid.

Accordingly, the $65,239.58 ($64,732.96 plus the $497.62 in the supplementary affidavit) claimed is approved for reimbursement. In addition, Disney Mobile is entitled

to any additional amount it pays for the JAMS administrative and professional fees for the preparation of this Final Award.

### C. Pre-Award Interest

Claimant seeks pre-Award interest at a rate of 1.5% per month. This is the contractual rate of interest for unpaid invoices. Claimant argues that this rate should be applied from October 22, 2007 – the date that the last of the invoices at issue should have been paid – until the date of the "Award." Claimant also seeks "post-Award" interest at the New York statutory rate of 9% per annum until the date of payment to be applied both to the damage award and to the amount awarded for fees and costs.

DCW does not oppose the requested rates or the application of the "post-Award" statutory rate to both the damage amount and to the amount awarded for fees and costs.

The Arbitrator awards 1.5% per month, to be calculated on a simple basis, between October 22, 2007 and June 22, 1010, the date of this Final Award. The application of this rate to the $382,539.50 results in pre-Final Award interest of $183,618.96 (32 months X 1.5% per month X $382,539.50).

As requested, Disney Mobile is entitled to post-Final Award interest at the rate of 9% per annum to be calculated on a simple basis and applied to the total of the damages and attorneys' fees and costs. This interest runs from June 23, 1010 until the date of payment.

## III.   FINAL AWARD of the Arbitrator

For the reasons stated above, the undersigned Arbitrator awards, on a final basis, as follows:

1.  Disney Mobile is awarded the sum of $382,539.50 in damages.

2.  Disney Mobile is awarded pre-Final Award interest of $183,618.96.

3.  Disney Mobile is awarded $271,717.86 as reimbursement for the reasonable attorneys' fees it incurred in litigating this Arbitration proceeding.

4.  Disney Mobile is awarded $65,239.58 s reimbursement for the expenses it paid in the litigation of this Arbitration proceeding. In addition, Disney Mobile is entitled to any additional amount it pays for the JAMS administrative and professional fees for the preparation of this Final Award.

5.  Disney Mobile is entitled to post-Final Award interest at 9% per annum to be calculated on a simple basis and applied to the total of the damages and attorneys' fees and costs. This interest runs from June 23, 1010 until the date of payment.

6. Disney Mobile is entitled to a declaration that to the extent DCW sells or otherwise uses the handsets at issue, all of Disney Mobile's intellectual property must be removed.

7. Any other claims for relief by Disney Mobile are denied.

8. Any claims for relief by DCW are denied.

So Ordered.

*Michael Young*

Michael D. Young

Arbitrator

DATED:   New York, New York

June 22, 2010

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in, and who executed, the instrument which is my FINAL AWARD.

*Michael Young*

Michael D. Young

Arbitrator

DATED:   New York, New York

June 22, 2010.

# <u>CERTIFICATION OF AWARD</u>

Re: WDIG Mobile, LLC vs. Digital Communications Warehouse, Inc.
Reference No. # 1425002360

I, Elizabeth Carter, Business Manager of the JAMS New York Resolution Center, declare that the attached is a true and correct copy of the Final Award served on June 22, 2010.

Dated May 11, 2011

Elizabeth Carter
ecarter@jamsadr.com

**VICKIE L. JOHNSTON**
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 2012

*WDIG Mobile v. Digital Communication Warehouse, Inc.*

# Exhibit B

| | |
|---|---|
| In the Matter of the Arbitration Between : | |
| WDIG MOBILE, LLC.,                  : | |
| Claimant ,                          : | **JAMS** |
|                                     : | **Reference # 1425002360** |
| vs.                                 : | |
|                                     : | |
| **DIGITAL COMMUNICATIONS**          : | |
| **WAREHOUSE, INC.,**                : | |
| **Respondent.**                     : | |
|                                     : | |

## PARTIAL FINAL AWARD

I, Michael D. Young, THE UNDERSIGNED ARBITRATOR, having been chosen by the parties to serve as Arbitrator, and having been duly sworn, and having duly heard the allegations and proofs of the parties, do hereby AWARD the following.

## I.   Introduction

In the autumn of 2006, two companies – WDIG Mobile, LLC ("Disney Mobile") and Digital Communication Warehouse Incorporated ("DCW") – executed a contract, effective October 24, 2006, under which Disney Mobile would sell specially branded and configured mobile phone handsets to DCW. *See* Equipment Purchase Agreement ("Contract") at 1-16.[1] In turn, DCW was allowed to sell the handsets to another company, Wonders of Wireless, Incorporated ("WOW").

Almost a year later, on September 27, 2007, Disney Mobile informed WOW (and thereafter DCW) that it was going out of business. At the time, DCW had not paid Disney Mobile for handsets covered by nine purchase orders and that Disney Mobile had finished delivering about a month earlier. After making repeated demands for payment, Disney Mobile began this Arbitration against DCW. *See* Demand for Arbitration Before JAMS ("Demand"); Notice of Intention to Arbitrate and Demand for Arbitration ("Compl.").

Disney Mobile's claims are grounded primarily in contract.[2] *See* Demand

---

[1] Citations to paragraphs of the Contract will be referred to only with paragraph symbols (¶ __).

[2] In its pre-hearing memorandum, Disney Mobile states that: "DCW concedes the few facts necessary to establish [Disney Mobile]'s claims for breach of contract and account stated, and to establish that [Disney Mobile] is entitled to recovery under theory of *quantum valebant* (value of goods furnished) . . ." Pre-Hearing Memorandum Submitted by Claimant WDIG Mobile, LLC at 1. Because the Arbitrator finds that Disney Mobile prevails on its contract claim, I do not address the issue of whether these quasi-contract and equitable claims were raised in the Demand or Complaint and, if not, should be precluded. Nor do I address the merits of these other bases for relief argued by Disney Mobile.

(describing its claim as "breach of contract, [and] account stated"); Compl. ¶¶ 1-16. Disney Mobile seeks "an award issued in [Disney Mobile's] favor in the amount of $382,539.50, plus interest, costs and attorney's fees. In addition, Disney Mobile requests that the award declare that [Disney Mobile's] intellectual property must be removed from any Equipment DCW intends to sell." Claimant WDIG Mobile, LLC's Post-Hearing Memorandum ("Cl. Mem.") at 36; *see also* Compl. ¶ 16 (listing relief requested).

DCW denies that Disney Mobile is entitled to the relief it seeks and, as will be discussed below, raises certain affirmative defenses. *See* Post-Trial Memorandum of Respondent Digital Communication Warehouse, Inc. ("Resp. Mem.") at 9-55; *see also* Respondent's Answer and Affirmative Defenses to Claimant's Claim in Arbitration ("Answer") at 1-12.

The Arbitrator recognizes and appreciates the high quality of the oral and written presentations by counsel for each party. The result of the proceeding, and that one party and not the other has prevailed, is not a reflection on any difference in the quality of those presentations, but of the Arbitrator's review of the record and the applicable law.

The Arbitrator's findings and conclusions, based on his assessment of the credibility of the witnesses, and on his review of the exhibits, the relevant case-law and of the arguments made in the pre-and post-hearing briefs and at final argument, are presented below. The Arbitrator has considered all of the issues and arguments raised, including those not explicitly addressed herein.

## II.     The Contract's Provisions Regarding Dispute Resolution

Paragraph 19.2(a) of the Contract sets forth the parties' obligation to arbitrate "any and all unresolved civil disputes and civil controversies of any nature between them arising at any time." ¶ 19.2(a). This paragraph also establishes that the proceeding is governed by "the Commercial Arbitration Rules (with Appeal Option) of the Judicial Arbitration and Mediation Service (JAMS) before one (1) arbitrator in accordance with such rules . . ." *Id.* Accordingly, the March 26, 2007 version of the JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), which is what JAMS views as its 'Commercial Arbitration Rules" for cases of this size and which was in effect at the time of the commencement of the Arbitration, applies to this proceeding.

Other relevant provisions of Paragraph 19 are: Paragraph 19.2(c) which provides that "the prevailing party shall be entitled to collect its attorneys' fees and expenses from the other party." ¶ 19.2(c); and Paragraph 19.2 (d) which states: "This arbitration shall take place in New York, New York (Manhattan) and the arbitrator(s) shall, in rendering its decision, apply the substantive law of the State of New York." ¶ 19.2(d). Thus, New York law applies to the substantive aspects of the dispute. I also conclude that, as required as a matter of law, New York law will also apply to any procedural issue not otherwise determined by Paragraph 19.2 or by the JAMS Rules even though the Contract does not explicitly state what law applies to procedural issues.

### III.   Procedural History

The history of this proceeding is as follows:

On June 23, 2008, Disney Mobile filed a Demand for Arbitration. *See* Demand; *see also* Compl. ¶¶ 1-16.

Around the time that Disney Mobile filed its Demand in this Arbitration proceeding in New York it also filed a Demand for Arbitration in California against WOW, which is referenced above and is a company that has certain cross-ownership and business relations with DCW. DCW sought, pursuant to JAMS Rule 6(e), to have the two proceedings consolidated, first by requesting that relief to the JAMS National Arbitration Committee ("NAC") and then to the undersigned Arbitrator. The NAC – a group of JAMS neutrals selected from its panels to make certain administrative decisions regarding the conduct of arbitrations at JAMS, including consolidation requests – denied (through one of its designated members) the application by DCW, but gave DCW leave to renew the motion before the undersigned Arbitrator.[3] In a written decision dated February 16, 2009, I also denied the motion, concluding that the applicable New York case law, as well as Paragraph 19.2 of the Contract and the contract clause governing the California proceeding, when read together, preclude such consolidation under the circumstances reflected in the record herein.

Following the denial of the consolidation application, DCW sought leave to file a late Answer or other responsive pleading. The Arbitrator granted such leave, but denied DCW's request also to file counterclaims. In response to Disney Mobile's argument that the filing of such counterclaims would be "futile," the Arbitrator required DCW to articulate the grounds of the purported counterclaims. In a written decision, dated April 29, 2009, the Arbitrator ruled that:

> Respondent may plead as a defense that Claimant breached the contract between them and may also plead equitable defenses (subject to Claimant's right to seek to strike said contract and equitable defenses as part of any to-be scheduled motion practice), but Respondent has not articulated a theory that would entitle it to damages and therefore at this point in time can not file a counterclaim. If the record develops in a way to show at least an arguable entitlement to damages, Respondent may at that time seek leave to amend its answer . . . or otherwise to file a counter-claim.

Thereafter the parties conducted limited, but contentious, discovery. Intervention of the Arbitrator was required on multiple occasions.

Three days of hearing were conducted on November 5 and 6 and December

---

[3]   The undersigned was at the time a member of the NAC, but was not involved in the NAC review of the consolidation request nor was I even aware that such a request had been made, until its was brought to my attention by DCW.

14, 2009. *See* Transcript ("Tr.") 1-276; 389-776; 777-985.  Nine witnesses presented testimony at the hearing, including two witnesses presented as experts and two witnesses appearing by telephone. All such witnesses were cross-examined. The Arbitrator accepted into evidence portions of the transcripts of various depositions and over 80 exhibits. The parties submitted briefs before and after the hearing and counsel conducted final argument on March 11, 2010.[4] *See* Cl. Mem. at 1-36; Resp. Mem. at 1-56; Tr. at 987-1184.

## IV.    The Arbitrator's Finding of Facts and Conclusions of Law

### A. Background on the Dispute

Companies such as Sprint Nextel ("Sprint") have their own licensed allocation of radio spectrum as well as the infrastructure required to provide mobile telephone service. In addition to selling mobile services directly to customers, these companies often sell their excess capacity to companies that do not have licenses or an infrastructure; the latter companies are known as Mobile Virtual Network Operators ("MVNOs"). The MVNOs then resell the mobile telephone services to other companies or individuals.

In June 2006, Disney Mobile started a MVNO business. By leasing cellular network capacity from Sprint, Disney Mobile sought to sell Disney-branded phones and accessories, as well as airtime, to customers by targeting the "family market." The phones had various family-oriented applications. For example, the specially branded handsets allowed parents to monitor children's use of the phone.

Around the time that Disney Mobile launched its MVNO business, it began to discuss selling Disney Mobile's handsets and services with three individuals – Stuart Lacheen, Bud Hirst, and Bart Greenwall.  These three individuals had experience in the industry and wanted to form a new company. The company that the individuals eventually started was WOW.

Although Disney Mobile would sell its phones and other accessories to WOW on a cash basis, Disney Mobile would not provide credit to WOW because this new company lacked a credit history. In order to overcome WOW's inability to purchase equipment on credit, it was proposed that Disney Mobile sell its equipment to another company, DCW, which had an established credit history and whose president was Lacheen (one of the three individuals who started WOW). DCW could then sell the Disney-branded equipment to WOW, after which WOW would be able to sell the equipment and others services either to sub-dealers or directly to consumers.

On October 23, 2006, Disney Mobile and DCW executed a sixteen-page contract. The Contract defined DCW as "Equipment Dealer" and explained in its background

---

[4] Additional exhibits were admitted, at the request of both parties, at the March 11, 2010 final argument. The hearing was therefore deemed closed, pursuant to JAMS Rule 22 (h), as of that date. Accordingly, this Interim Award is being issued, with consent of the parties, approximately 45 days after the close of the hearing.

section:

> Equipment Dealer is in the business of purchasing and selling Disney Mobile-branded mobile products to Authorized Disney Mobile Service Dealers.  This Agreement with Disney Mobile covers the sale of Disney Mobile-branded handsets and accessories to Equipment Dealer ('Equipment Agreement').

Contract at 1.

The following other provisions of the Contract are relevant to this dispute:

Under Section 3.1, Disney Mobile appointed DCW "on a non-exclusive basis to sell Equipment . . . solely and exclusively to Authorized Disney Mobile Service Dealers." ¶ 3.1 Likewise, Paragraph 4.1 states, "Equipment Dealer may only distribute Equipment to Authorized Disney Mobile Service Dealers."  ¶ 4.1.  Finally, Paragraph 6 of the Contract further states:  "Authorized Disney Mobile Service Dealers are set forth on Exhibit A hereto." ¶ 6. Exhibit A of the Contract lists WOW as the only service dealer to whom DCW may sell.[5]

Paragraphs 17.1, 17.2 and 17.3 address the situations in which the Contract could be terminated. Paragraph 17.1 sets forth how Disney Mobile and DCW could terminate the agreement for convenience. Paragraph 17.2 provides how Disney Mobile could terminate the Contract due to a material breach. Finally, and most relevant to this dispute, Paragraph 17.3 states in full:

> 17.3 "Termination for Cessation of Business or Bankruptcy."
>
> Either party may terminate this Agreement if it plans to exit its then current business by providing thirty (30) days prior written notice; provided that the terminating party in fact does so exit the business within a reasonable period time (e.g., 30-90 days). Regardless, this Agreement will automatically terminate one day following the date either Party ceases to do business, elects to dissolve, declares insolvency, has a receiver appointed, makes a general assignment for the benefit of creditors, or files (voluntarily

---

[5] Contrary to various arguments made by DCW, the Arbitrator concludes that the restriction on the ability of DCW to sell only to WOW is not legally significant. In addition, the Arbitrator notes that, in addition to the Contract, DCW and WOW had a contract between them (pursuant to which DCW sold equipment to WOW) and WOW and Disney Mobile similarly had a contract between them (called a Master Dealer Agreement, by which WOW was authorized by Disney Mobile to sell Disney Mobile branded-equipment and services to sub-dealers in return for commissions). Again, contrary to various arguments made by DCW, the Arbitrator concludes that each of these contracts established separate legal relationships between the parties to the specific agreement and that the existence of these other two contracts does not derogate any of Disney Mobile's rights under the Contract.

or involuntarily) any petition in bankruptcy or for relief under the provisions of the bankruptcy laws.

¶ 17.3.

Paragraph 17.5 is entitled "Effect of Termination – Equipment Sales" and addresses the actions that the parties could take if the Contract was terminated. Paragraph 17.5(a) states in relevant part that "Disney Mobile may, in its sole discretion offer to repurchase any or all Handsets in Equipment Dealer's inventory that" meet certain criteria (e.g., "in original packaging, unopened and undamaged") referred to as "**Return Criteria.**" ¶ 17.5 (emphasis in original). Paragraph 17.5(b) also states that the parties could agree to a period in which DCW "may sell-off remaining Equipment through Authorized Disney Mobile Service Dealers in the ordinary course (the '**Sell-off Period**')." *Id.* (emphasis in original). However, "[a] party is not required to offer or to agree to such a period . . . " *Id.* (emphasis in original).

Finally, Paragraph 17.5(c) states:

> If Equipment Dealer has any Equipment in its inventory at the end of the Term (or Sell-off Period, if later) that Disney Mobile does not repurchase, then Equipment Dealer shall only sell such Equipment to a third party in the ordinary course of business, but only in the U.S. and not knowingly to any party who intends to export such product outside the U.S.

¶ 17.5(c).

In the summer of 2007, a dispute arose between WOW and Disney Mobile over whether Disney Mobile was entitled to seek return of certain commissions paid to WOW. By September 19, 2007, counsel representing both WOW and DCW was involved in settlement negotiations with Disney Mobile on this issue. On September 26, 2007, WOW and DCW rejected settlement proposals made by Disney Mobile.

On September 27, 2007, Disney Mobile announced that it was leaving the MVNO business more than thirty days thereafter. Disney Mobile stopped activating new subscribers on September 27, 2007 and ceased providing services to previously activated customers and otherwise operating on March 31, 2008.

In a letter dated September 28, 2007, Disney Mobile stated that DCW owed money related to four invoices. DCW did not pay these invoices and then did not pay when five additional invoices became due.

**B. Disney Mobile Has Carried Its Burden with respect to Its Breach of Contract Claim**

Putting aside for now the affirmative defenses pled by DCW, Disney Mobile has

carried its burden with respect to its breach of contract claim.

The most relevant provision to this issue is Paragraph 9.5 of the Contract, which states: "Equipment Dealer shall pay each proper invoice within sixty (60) days after its receipt of that invoice." ¶ 9.5.

The evidence shows that Bart Greenwell, a vice president of DCW, ordered the handsets. After being ordered, the handsets were delivered to DCW's warehouse, which was in Pennsylvania.

The evidence also shows that the following invoices were for the handsets ordered and delivered and also that these invoices were not paid:[6]

> July 19, 2007
> July 19, 2007
> July 23, 2007
> July 24, 2007
> August 1, 2007
> August 2, 2007
> August 10, 2007
> August 22, 2007
> August 22, 2007

After receiving the handsets, DCW did not object to the amount charged or the number of handsets provided. Nor did DCW claim at the time the handsets were defective or otherwise flawed prior to the commencement of the Arbitration.[7]

DCW does not dispute that the invoices are unpaid. Although there is some confusion as to whether all of the handsets reflected on the above invoices are in DCW's warehouses, DCW argues that it was ready, willing and able to return those handsets to DCW and that it should have been able to do so once Disney Mobile exited the business and stopped activating customers. But, DCW does not argue that it would not have been obliged to pay had Disney Mobile not exited the business.

---

[6] While DCW asserted in its Answer that it did not receive these invoices, DCW does not now dispute that it did receive them.

[7] As will be discussed in greater detail in connection with the DCW affirmative defenses, according to Paragraph 11.1 of the Contract, "Title, risk of loss and responsibility for shipping and insurance pass to the [Equipment] Dealer upon delivery . . ." ¶ 11.1. Under paragraph 11.3, "[w]ithin five (5) business days of receipt of the shipment," DCW was required to "notify Disney Mobile in writing of any shortages, defects, damages or non-conformance with Purchase Orders" ¶ 11.3(a). In addition, "[w]ithin five business days of receiving a Defective Handset (defined below), Equipment Dealer shall notify Disney Mobile in writing of such defects and return such Defective Handset in accordance with the return process." ¶ 11.3(b).

Accordingly, the Arbitrator concludes that Disney Mobile has carried its burden in showing that DCW has breached the Contract. Disney Mobile has shown that:

1. The handsets reflected in the invoices were delivered.

2. DCW did not take advantage of any of its rights to return the handsets pursuant to Paragraph 11 of the Contract.

3. DCW had an obligation to pay for the handsets within sixty days of the invoice, which it did not do.

4. The Contract does not provide that DCW's obligation to pay was altered by the announcement by Disney Mobile on September 27, 2007 that it was exiting the business.

5. The parties did not agree to any alternative arrangement under Paragraph 17.5 of the Contract that would relieve DCW of its obligation to pay the invoices or otherwise to alter its obligations. [8]

Disney Mobile has also carried its burden in showing that, once the amounts on the above invoices are properly adjusted for certain amounts that were credited to DCW, that the amount owed is the $382,529.50 (putting aside interest).

### C. DCW Has Not Proven Its Affirmative Defenses

"Under New York law, a party asserting an affirmative fact bears the burden of proving that defense by preponderance of the evidence – this applies to affirmative claims and defenses." Resp. Mem. at 9 (citations omitted). DCW contends that "[a]pplying this standard, DCW's affirmative defenses bar Disney Mobile's ability to recover on its claims of breach of contract . . . ." *Id.* at 10.

According to DCW:

> The facts establish that Disney Mobile itself breached the parties' contract when it violated both its express warranties and the implied warranties of merchantability and fitness for a particular purpose, and when it engaged in conduct violating the standards of honesty and good faith and fair dealing imposed by the New York Uniform Commercial Code, New York common law, and the Equipment Purchase Agreement itself.

*Id.* DCW also argued other affirmative defenses including, most significantly, that its

---

[8] As indicated below, the Arbitrator concludes that DCW has not proven its affirmative defenses. Accordingly, Disney Mobile has proven its breach of contract claim; and, as previously noted, because Disney Mobile has proven its breach of contract claim, there is no need to analyze its quasi-contract and equitable claims.

failure to pay should be excused because the purpose of the Contract was frustrated.

As explained below, DCW has not proven any of its affirmative defenses.[9]

### 1. Disney Mobile Did Not Breach the Contract's Expressed and Implied Warranties

DCW first argues "[t]hat the evidence establishes that the handsets at issue in this action were and remain defective, as explicitly defined by the parties in the [Contract], because they were rendered incapable of being activated." Resp. Mem. at 11; *see also id.* at 10-31. DCW attempts to support its conclusion that the handsets were defective by arguing that "[t]he parties set forth several definitions in the [Contract] that govern the issue of defectiveness" including Paragraph 1.6. *Id. See also id.* ("There is absolutely nothing in the Agreement that would permit a reasonable observer to conclude that either party meant 'defective' to mean anything other than what Paragraph ¶ [sic] 1.6 says."). DCW concludes:

> Accordingly, the plain language of the [Contract], along with the testimony and other evidence adduced in this Arbitration, yield the unmistakable conclusion that . . . from the moment Disney Mobile prohibited new activations, its devices were defective – i.e., unfit for the purpose and manner for which they were intended. This alone affords DCW a complete defense to liability on Disney Mobile's claims for relief.

Resp. Mem. at 31; *see also* Resp. Mem. at 14 ("[The Contract] set[s] down a precise definition of 'defective,' and Disney Mobile cannot now escape the plain meaning of the provisions it chooses (and ones that it drafted, no less) because such provisions are now inconvenient." ).

I reject, as a matter of contract interpretation, DCW's argument that the handsets are defective because they are no longer capable of providing the Disney Mobile service or of functioning on what had been the Disney Mobile network.

Paragraph 1.6 states: "Defective means a Handset that fails immediately out of the package prior to or during initial Activation." ¶ 1.6. DCW's proffered interpretation of "defective" would render the phrase "prior to" meaningless. *Id.* It is conceptually inconsistent for a handset to be defective because it "fail[s] . . . prior to . . . initial Activation" and to be defective because it fails to activate. This language requires that something else must be wrong with the handset to cause it to fail either before or during activation.

---

[9] DCW's Answer raises seven affirmative defenses. *See* Answer ¶¶ 17-24. In its post-hearing brief, however, DCW focuses on the affirmative defenses addressed in the text. The Arbitrator views the others as either waived or not sufficient to warrant relief.

The language of Paragraph 1.6 shows that "defective" is limited to physical defects—or what Disney Mobile has termed "inherent" defects – in the handset. Indeed, the only interpretation of "defective" that gives meaning to all of the words in Paragraph 1.6 is one that limits the defects to physical ones, such as a bad receiver or other malfunctioning component part, so that the handset can fail "prior to" as well as "during" the initial Activation.

But, far more important to the construction of the Contract is that Paragraph 1.6 does not impose any obligations on Disney Mobile. Rather, Paragraph 1.6 is merely a definition. The actual warranty is found in Paragraph 10.4, which is entitled "Warranty."[10] ¶ 10.4 (emphasis in original). Paragraph 10.4 states: "Disney Mobile shall provide with each Handset a warranty that includes **standard protection** against defects ***in design and manufacture, given normal use***, for a period of one year from date of purchase." *Id.* (emphasis added).

Two parts of Paragraph 10.4 demonstrate that the express warranty is limited to physical defects. First, the Contract's warranty is only for "defects ***in design and manufacture***." *Id.* (emphasis added). This language plainly limits the scope of the warranty to two particular types of defects and does not extend to situations where Disney Mobile has rendered its network inoperable because it is no longer in business. Even if an inability to activate due to the service no longer being available is considered a defect under Paragraph 1.6, it is not a defect in design or manufacture and therefore would not be subject to the Paragraph 10.4 express warranty. Second, the phrase "given normal use" indicates that the Paragraph 10.4 warranty assumes that the handset is being used. It would not be considered in use if the service were suspended.[11]

In light of Paragraphs 1.6 and 10.4, DCW's affirmative defense for breach of the express warranty must fail. DCW did not prove that there was any physical or "inherent" design or manufacturing defect in the handsets. The record shows that the handsets at issue were not inoperable or defective when delivered to DCW in July and August 2007. Indeed, the record reflects that just prior to the September 27, 2007 Disney Mobile announcement these same handsets could connect with the network and would otherwise function properly. The Arbitrator also finds that if Disney Mobile were to resume today the same service it discontinued in 2007, that the handsets at issue could provide that service.

---

[10] In its Answer, DCW anchors this affirmative defense on Paragraph 10.4.  *See* Answer ¶ 20 (asserting that Disney Mobile "breached its contract with [DCW] as a result of its violation of its express warranty against defects, set out in Section 10.4 of the Equipment Purchase Agreement.").  In its brief, however, DCW mainly focuses on paragraph 1.6.  *See* Resp. Mem. at 12-14.

[11] In addition, Paragraph 10.4 only provides for a "standard protection against defects."  ¶10.4. The Arbitrator finds that DCW did not satisfy its burden in proving that the protection it seeks is standard for such contracts in the MVNO business.

I also reject the DCW argument, as articulated by its expert James Fraley, that after the termination of the Disney Mobile service, the handsets could no longer be FCC-compliant and therefore would violate the Paragraph 10.4 warranty on that basis. First, the handsets were clearly FCC-compliant at the time of the delivery, prior to the shutdown of the Disney Mobile service. Consequently, this argument appears to be a variant on the contention that the inability of the handsets post-shutdown of the business to operate on the Disney Mobile network constitutes a defect. Second, DCW did not carry its burden of proof that in fact the handsets post-shutdown were not (or could not be re-flashed to be) FCC-compliant, particularly in light of the testimony of Robert Kahn whose company purchased from Disney Mobile the same type of handsets at issue here and successfully re-flashed and re-branded them so that they could be sold and used over other networks.

DCW also failed to prove Disney Mobile breached an implied warranty of merchantability. (The Arbitrator assumes for purposes of this discussion that Disney Mobile did not effectively disclaim the warranties that are implied in New York law.) New York Commercial Code § 2-314(1) provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C. § 2-315; *see also Denny v. Ford Motor Co.*, 87 N.Y.2d 248 (1995). To establish that a product is defective for purposes of a breach of implied warranty of merchantability claim, a party must show that the product was not 'reasonably fit for [its] intended purpose.'" *Wojcik v. Empire Forklift, Inc.*, 14 A.D.3d 63, 66, 783 N.Y.S.2d 698, 700-01 (3d Dep't 2004) (citations omitted). The handsets here are reasonably fit for their intended purposes for the same reason that they did not violate the express contractual warranty: they were fully capable of operating prior to the cessation of the service, can still operate now as cell phones on wireless networks and are only unable to operate on the Disney Mobile System because the company has ceased to do business, a circumstance that does not breach the implied warranty of merchantability.

Finally, DCW failed to prove breach that Disney Mobile breached an implied warranty of fitness for a particular purpose. New York Uniform Commercial Code § 2-315 governs the implied warranty of fitness for a particular purpose and provides, in relevant part: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required *and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods*, there is . . . an implied warranty that the goods shall be fit for such purpose." N.Y. U.C.C. § 2-315 (emphasis added). Thus, to show a breach of this implied warranty, DCW must satisfy the following requirements:

> [T]he buyer must establish that [1] the seller had reason to know, at the time of contracting, the buyer's particular purpose for which the goods are required and that [2] the buyer was justifiably relying upon the seller's skill and judgment to select and furnish suitable goods, and [3] that the buyer did in fact rely on that skill.

*Saratoga Spa & Bath v. Beeche Sys. Corp.*, 230 A.D.2d 326, 656 N.Y.S.2d 787, 790 (3rd

Dept. 1997).

DCW failed to establish that it relied on Disney Mobile's "skill and judgment to select and furnish suitable goods." *Id.* Moreover, any claim by DCW that it relied on Disney Mobile to provide it with handsets that would always provide Disney Mobile services – even if Disney Mobile exited the business -- would be unreasonable and unjustified in light of Paragraph 17 of the Contract.[12]

### 2.   Disney Mobile Did Not Breach the Implied Covenant of Good Faith and Fair Dealing

DCW argues that "New York courts hold that a defendant may assert breach of the covenant of good faith and fair dealing as an affirmative defense." Resp. Mem. at 31 n.24; *see also id.* at 31-44. DCW further asserts that "Disney Mobile's multiple violations of its obligations of honesty, good faith, and fair dealing imposed by New York law and by the [Contract] constitute a breach of the [Contract] and also provide DCW a complete defense against Disney Mobile's claims." *Id.* at 31. DCW argues that many of the Disney Mobile actions violated this covenant including when it allegedly (1) withheld commission payments from WOW, *see id.* at 33-35, (2) reneged on certain representations, *see id.* at 35-42, and (3) never notified DCW of its shutdown, *see id.* at 42-44.

A covenant of fair dealing and good faith is implicit in all contracts and "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989); *see also Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933). A breach of the covenant of good faith and fair dealing, however, can not be used to impose an obligation "which would be inconsistent with other terms of the contractual relationship." *Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 335 (1987). "The implied covenant 'does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.'" *U.S. Bank Nat. Ass'n v. Ables & Hall Builders*, - F.Supp.2d -, 2010 WL 996761 S.D.N.Y. 2010) (quoting *Thyroff v. Nationwide Mut. Ins.*, 460 F.3d 400, 408 (2d Cir. 2006).

The Arbitrator rejects the initially articulated DCW argument that Disney Mobile's refusal to take back in the handsets after announcing that it would no longer activate customers constitutes a breach of this implied duty. The plain language of Paragraph 17 allows Disney Mobile to act in that manner. Specifically, Paragraph 17.3 shows that the parties contemplated that Disney Mobile could stop doing business at any time. Paragraph 17.3 states: "Regardless, this Agreement will automatically terminate one day following the date either Party ceases to do business . . . " *Id.* Moreover, the plain language of Paragraph 17.5 also demonstrates that the parties contemplated that

---

[12] Because the Arbitrator makes the foregoing findings, he need not resolve the legal issue as to whether Disney Mobile disclaimed any implied warranties, as Disney Mobile argued that it did. *See* Cl. Mem. at 21-23.

DCW might have equipment in its inventory when the Contract was terminated. In such circumstances, according to the Contract, payment for previously ordered handsets would still be due, subject to DCW's rights to seek to mitigate its obligation. Paragraph 17.5 gives Disney Mobile "sole discretion" to offer to repurchase any or all Handsets in Equipment Dealer's inventory and clearly does not mandate that it do so. ¶ 17.5(a). Accordingly, any finding of a breach of an implied covenant on this basis would be inconsistent with the explicit terms of the Contract.

Moreover, based on the evidence presented at the hearing, I find that the other mitigation opportunity that DCW was given by the Contract – to re-sell to a third party purchaser – was meaningful. Disney Mobile proved that the handsets could be re-flashed and re-branded and function today by providing voice and text message services over a non-Disney Mobile network. Disney Mobile's expert demonstrated that two exemplar handsets could provide such services, each over a different network. In addition, as previously indicated, the Arbitrator, on balance, credits the testimony of Disney Mobile witness Kahn whose company purchased and re-sold the same handsets at issue here. Thus, the remedy provided for Paragraph 17.5 was meaningful and not illusory.

The explicit language of the Contract also precludes DCW's argument that Disney Mobile violated the implied covenant of good faith and fair dealing in other respects. In particular, DCW's argues that that:

> Given the sheer volume of Disney Mobile's business that was coming from WOW (with support from DCW), the withholding of $2 million in commissions for future chargebacks is a strong indication that [the] Disney Mobile had already decided by August 2007 that it would go out of business. Far from reflecting consistency with DCW's justified expectations, Disney Mobile's unjustified confiscation of the commissions was plainly inconsistent with the obligations of honesty, integrity and good faith and fair dealing expressly imposed by the [Contract] and impliedly by New York law.

Resp. Mem. at 35.

The thrust of the above argument is unclear, but DCW would not prevail however it is interpreted. If DCW is arguing that Disney Mobile violated the covenant of good faith and fair dealing because it allegedly failed to pay certain commissions to WOW, this argument must fail because it does not relate to DCW's contract with Disney Mobile and therefore any such failure, even if proved, would not excuse any contractual obligation that DCW has to Disney Mobile.

If the above is another variant on the argument that Disney Mobile violated the implied covenant by going out of business, this argument is defeated, as set forth above, by Paragraph 17.3, which explicitly allowed Disney Mobile to

terminate the Contract at any time by going out of business. In addition, the record shows that before executing the Contract DCW knew about another MVNO business venture related to Disney Mobile (involving Disney Mobile ESPN) that had shut down. Thus, DCW knew even prior to entering into the Contract that Disney Mobile could go out of business. Finally, even if Disney Mobile had made its decision in August - a fact that DCW did not prove - there would be nothing about this circumstance that would violate any implied covenant.

DCW's also argues that Disney Mobile violated the implied covenant by allegedly reneging on certain representations to it. In particular, according to DCW, "Disney Mobile provided every indication that they would work with WOW and DCW to take back the handsets in DCW's inventory, both directly and through its announced handset recovery program." Resp. Mem. at 35. DCW also argues that Disney Mobile did not act in good faith by reaching settlements with other dealers, including accepting a return of handsets, but not with it.

This argument is not persuasive because it fails to point to any language in the Contract that even implicitly required Disney Mobile to take back the handsets.[13] Indeed, the exact opposite is true: the language of Paragraphs 17.5(a) and 17.5(c) precludes imposing (through the implied covenant of good faith and fair dealing) any requirement that Disney Mobile repurchase or accept a return of any handsets in its possession once the Contract was terminated. The fact that Disney Mobile may have reached settlements with other dealers has no bearing on whether the Contract had implied duty to do so that was violated.

DCW's third, and final, argument with respect to this affirmative defense is that "Disney Mobile never sent notification to DCW regarding its intent to exit the wireless industry." Resp. Mem. at 42 (emphasis added). According to DCW, "given the parties' inclusion of ¶ 17.3's notification provisions in the first place, and the amicable relationship it was plainly intended to foster, it is unreasonable to maintain that Disney Mobile was in good faith when it exercised that discretion." Id. at 44.

If DCW is arguing that Disney Mobile violated a specific provision of the Contract, it cannot argue that Disney Mobile violated the implied covenant of good faith and fair dealing because the latter is a doctrine that deals with implicit – not explicit – contractual requirements. If DCW is, however, asserting that Disney Mobile breached the Contract by failing to provide written notice, as required by Paragraph 17.3, then DCW has failed to show damages from this

---

[13] DCW also cites cases related to estoppel, which do not apply to its affirmative defense alleging breach of implied covenant of good faith and fair dealing. See Resp. Mem. at 38. Moreover, to prove that Disney Mobile is estopped by its conduct or the representations of its authorized agents, DCW would have to show that it relied to its detriment on such representations. But, DCW did not take any steps to its detriment on reliance on any such representations. Moreover, it is far from clear that any such representations were authorized.

technical breach.[14]  DCW knew that Disney Mobile was going to terminate once settlement discussions broke down and was in constant communication with Disney Mobile after September 27, 2007, to discuss returning the handsets. The failure of Disney Mobile to send written notice, as opposed to orally informing DCW, did not harm DCW because, inter alia, it did not order any handsets after September 27, 2007 in reliance on continued service.

The above analysis also applies to the DCW argument that Disney Mobile violated the Contract's explicit requirement in Paragraph 21.2 of good faith implementation. For the reasons indicated, this affirmative defense also fails.

### 3.    Disney Mobile Did Not Frustrate the Contract's Principal Purpose Or Repudiate the Contract

DCW has argued that the Contract's principal purpose was frustrated when Disney Mobile stopped activating new subscribers on September 27, 2007, because DCW could no longer sell the handsets to WOW. *See* Resp. Mem. at 44-48, But, as even DCW acknowledges, frustrating of purpose can only occur when an event occurs that was not contemplated or not included within the assumed risks of the Contract. *See* Resp. Mem. at 44 ("To invoke the defense, the supervening event must not be reasonably foreseeable by the parties . . . ."); *see also Neumann v. Metropolitan Med. Group*, 161 A.D.2d 1106, 1107, 557 N.Y.S.2d 663, 663 (3d Dep't 1990) ("plaintiffs' cause of action seeking a declaration that the contract was terminated by frustration of purpose was correctly rejected, as the record demonstrates that the alleged 'frustration', Falkirk Hospital's cessation of operations, was contemplated by the contract.").

Paragraph 17 shows, however, that DCW was aware that the Disney Mobile could go out of business and, if so, it could be left to dispose of its inventory by selling the handsets to third parties. *See* ¶ 17.5 ("Inventory Disposal.") (emphasis in original). Indeed, DCW concedes as much. *See* Resp. Mem. at 45 (" . . . DCW does not argue that Disney Mobile's decision to exit the wireless MVNO business—an act specifically provided for in the Equipment Purchase Agreement—constitutes the basis for DCW's affirmative defense.").

DCW attempts to overcome this hurdle by arguing, "the crux of DCW's defense is that *when* Disney Mobile made the decision to go out of business, it also attempted to force DCW to pay for devices that were no longer suitable for the purpose underlying DCW's entry into the [Contract] in the first place." *Id.* (emphasis added). This argument is beside the point, however, as the issue under a frustration of purpose defense is whether the supervening event was foreseeable. Since this result was foreseeable, DCW may not assert this defense.

Likewise, Disney Mobile did not repudiate the Contract. To support a claim of anticipatory repudiation, there must be an unqualified and clear refusal to

---

[14] Disney Mobile sent written notice to WOW.

perform with respect to the entire contract.  In this case, far from repudiating this Contract, Disney Mobile exercised its right under the Contract to terminate it by ceasing to do business.  *See* ¶ 17.3 ("<u>Terminations for Cessation of Business or Bankruptcy</u>.") (emphasis in original).

### 5.    DCW Does Not Have a Claim in Equity

DCW's final argument is that Disney Mobile has "consistently frustrated DCW's attempts to delineate which of these devices [related to the nine invoices] either party is responsible for."  Resp. Mem. at 51.  According to DCW:

> Evidence presented at trial established that Disney Mobile had a program whereby it reimbursed end-user customers for devices in their possession, and that Disney Mobile both accepted devices back from some customers . . . and instructed other customers not to return their devices.  An accounting of precisely which devices went where is critical to accurately determining how much payment, if any, each party is actually entitled to.

Resp. Mem. at 51.  DCW bases this contention on equity.  *See id.*

DCW's argument fails as a matter of law because the existence of a valid and enforceable contract precludes recovery in equity.  Moreover, whether Disney Mobile decides to accept some handsets back from some customers does not change the fact that the Contract delineates DCW's legal obligations.

In addition, even if some customers were allowed to return handsets, that fact does not entitle DCW either to a defense or an offset (measured by the costs of the handsets that were accepted back).  First, the bulk of the handsets at issue are still to be found in DCW's (or WOW's) warehouse.  Even if Disney Mobile may have taken some of the phones at issue in the invoices back from customers, that circumstance cannot be a defense to the portion of the claim relating to handsets purchased by DCW, but not distributed to customers.

Second, if some of the handsets at issue were sold to retail customers prior to the cessation of business by Disney Mobile, that customer would have paid for the handset and a commission would have been issued by Disney Mobile;[15] at least some portion of those amounts would have been paid to DCW.  Under such circumstances, there is nothing inequitable about DCW being required to pay Disney Mobile for the handset, even if Disney Mobile either or both took the phone back from the retail customer and/or reimbursed that customer for the cost of the phone.  Indeed, it would be a windfall to DCW if it were not required to pay for the handset under these circumstances since it would have been paid.

---

[15] Since Disney Mobile only took back handsets from customers "in good standing," a commission would have been paid and would not have been subject to a charge-back.

Finally, there may be circumstances where DCW did not receive any payment for handsets that were eventually sent back by the customer to Disney Mobile. By accepting the phones back, Disney Mobile might both be requiring payment from DCW but not allowing for DCW to get paid and/or would be precluding DCW from trying to mitigate. But, DCW did not prove that the former circumstance existed. As for the lost opportunity to mitigate, DCW has not heretofore shown any desire or effort to mitigate. Under these circumstances, there would be no basis in logic or fairness either to uphold a defense or this basis or to allow for an offset of some sort.

More generally, the Arbitrator recognizes that there might be considered some unfairness in requiring DCW to pay for handsets that lost significant value when Disney Mobile went out of business. But, DCW accepted that risk when it signed the Contract and now must comply with its contractual obligations.

## V.    PARTIAL FINAL AWARD of the Arbitrator

For the reasons stated above, the undersigned Arbitrator awards, on a partial final basis, as follows:

1.  Disney Mobile is awarded the sum of $382,539.50 in damages.

2.  Disney Mobile is entitled to pre-Award and post-Award interest in an amount to be determined. Disney Mobile is also entitled to be reimbursed its reasonable attorneys' fees and costs in litigating this Arbitration proceeding. Disney Mobile should file, on or before May 17, 2010 an application for said amounts, specifying what it believes to be due along with supporting documentation and argument. DCW may file an objection on or before June 2, 2010. No reply or oral argument will be allowed unless requested by the Arbitrator.

3.  Disney Mobile is entitled to a declaration that to the extent DCW sells or otherwise uses the handsets at issue, all of Disney Mobile's intellectual property must be removed.

4.  Any other claims for relief by Disney Mobile are denied.

5.  Any claims for relief by DCW are denied.

So Ordered.

Michael D. Young
Arbitrator

DATED: New York, New York
        May 2, 2010

# CERTIFICATION OF AWARD

Re: WDIG Mobile, LLC vs. Digital Communications Warehouse, Inc.
Reference No. # 1425002360

I, Elizabeth Carter, Business Manager of the JAMS New York Resolution Center, declare that the attached is a true and correct copy of the Partial Final Award served on May 2, 2010.

Dated May 11, 2011

Elizabeth Carter
ecarter@jamsadr.com

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 2012

*WDIG Mobile v. Digital Communication Warehouse, Inc.*

# Exhibit C

## EQUIPMENT PURCHASE AGREEMENT

THIS EQUIPMENT PURCHASE AGREEMENT (**"Agreement"** or **"Equipment Agreement"**), effective as of October 24, 2006 (the **"Effective Date"**), is by and between WDIG Mobile, LLC, a Delaware corporation with principal offices in Burbank, California (**"Disney Mobile"**) and the entity set forth below (**"Equipment Dealer"**).

| Equipment Dealer: Full Corporate Name | State of Incorporation | Contact Info: | |
|---|---|---|---|
| Digital Communication Warehouse Incorporated | PA | Address | 6186 Ridge Avenue Philadelphia, Pa. 19128 |
| | | Contact Name | Stuart W. Lacheen, President |
| | | Email | swlacheen@aol.com |
| | | Phone | 215-483-2200 Ext 110 |

### Background

Equipment Dealer is in the business of purchasing and selling Disney Mobile-branded mobile products to Authorized Disney Mobile Service Dealers.  This Agreement with Disney Mobile covers the sale of Disney Mobile-branded handsets and accessories to Equipment Dealer (the **"Equipment Agreement"**).

In consideration of the mutual covenants and the promises contained below, the parties agree as follows:

**1.      DEFINITIONS.**

1.1      Accessories means Disney branded items which complement the Handsets including but not limited to batteries, chargers, holders, faceplates, beltclips, etc., approved by Disney Mobile for distribution under this Agreement.  "Accessories" refers only to Disney Mobile-branded and Disney Mobile-approved accessories, and by definition does not include other accessories that Equipment Dealer purchases, at its sole risk, to operate with Equipment.

1.2      Activation or Activate means the initiation of the Service for a Customer.

1.3      Affiliate means any person, partnership, corporation, or other business association (hereinafter **"Person"**) that directly or indirectly controls, is controlled by, or is under common control with another Person.  Control shall be defined as (i) ownership of a majority of the voting power of all classes of voting stock, or (ii) ownership of a majority of the beneficial interests in income or capital of an entity other than a corporation.

1.4      Authorized Disney Mobile Service Dealers means those third party authorized by Disney Mobile to offer and sell Equipment and Disney Mobile Service to Customers and expressly set forth in **Exhibit A** hereto.

1.5      Customer means a person who subscribes to Services and/or purchases Disney Mobile-branded Equipment, from Authorized Disney Mobile Service Dealers.

1.6      Defective means a Handset that fails immediately out of the package prior to or during initial Activation.

1.7      Designated Supplier means Disney Mobile or the third party or third parties solely and exclusively designated by Disney Mobile in writing from whom Equipment Dealer may purchase Equipment.

1.8      Equipment means the Handset and Accessories.

1.9      Event of Default means any of the following:

(a)      failure of either party to pay any sum owed to the other hereunder at the time such amount comes due;

(b)      failure of either party to perform or observe any other material term, condition, or covenant to be performed by it under this Agreement;

(c)      filing of any felony charges against a party, its officers or its directors; or

(d)       an unauthorized assignment of this Agreement.

1.10     <u>Handset(s)</u> means the mobile phone handsets for use with the Service that a Designated Supplier offers for sale in its discretion, to Equipment Dealer and which are purchased by Equipment Dealer from a Designated Supplier in accordance with this Agreement.

1.11     <u>Service</u> means the Disney Mobile wireless telecommunications service offered by Authorized Disney Mobile Service Dealers to Customers.  .

## 2.     TERM

2.1     <u>Initial Term</u>.  The initial term of this Agreement is two (2) years, commencing on the Effective Date, unless earlier terminated in accordance with Section 17(the **"Initial Term"** and together with any extensions, the **"Term"**).

2.2     <u>Extensions</u>.  This Agreement shall be automatically renewed for additional one-year periods unless otherwise terminated in accordance with Section 16.

## 3.     AUTHORIZATION

3.1     <u>Appointment of Authorized Equipment Dealer</u>.  Disney Mobile appoints and Equipment Dealer accepts appointment, on a non-exclusive basis to sell Equipment (purchased from Disney Mobile or other Designated Supplier) solely and exclusively to Authorized Disney Mobile Service Dealers.

3.2     <u>Equipment Dealer Responsibilities</u>.  Equipment Dealer is responsible for insuring compliance with the terms and conditions of this Agreement.  Equipment Dealer may only sell Equipment and then only directly to Authorized Disney Mobile Service Dealers.  Equipment Dealer agrees to indemnify Disney Mobile and its Affiliates for any claim, including liabilities or expenses of any nature whatsoever, arising in connection with Equipment Dealer's performance hereunder.

3.3     <u>Limitation.</u>  Equipment Dealer agrees that it is in no way authorized to franchise any Disney Mobile-related business.

3.4     <u>No False Information.</u>  Equipment Dealer shall not make a material misrepresentation, or provide false or fraudulent information, to Disney Mobile, its Affiliates or to any Authorized Disney Mobile Service Dealer (or potential Authorized Disney Mobile Service Dealer), including without limitation inaccurate information regarding Equipment Dealer, Disney Mobile or the Equipment.

## 4.     METHODS OF DISTRIBUTION

4.1     <u>Equipment</u>.  Equipment Dealer may only distribute Equipment to Authorized Disney Mobile Service Dealers.

4.2     <u>Competition</u>.  Disney Mobile shall have the continuing right to: (a) market, offer for sale and sell Equipment to third parties in competition with Equipment Dealer, either directly or through indirect marketing channels.; and (b) restrict certain Equipment to certain channels (e.g., e-commerce plans, affinity plans, etc.), or to certain types of customers (e.g., business customers, referral customers, etc.).

4.3     <u>Advertising</u>.  This Agreement does not grant to Equipment Dealer any right to advertise, promote or market any Equipment or any Service, or to use "Disney" trademarks or copyrights, in any way whatsoever.

## 5.     CUSTOMER RELATIONSHIPS

Equipment Dealer acknowledges that as between the parties hereto and/or with regard to the Customer, Disney Mobile has complete ownership of the relationship with Customers that purchase Equipment  from Authorized Disney Mobile Service Dealers.

## 6.     AUTHORIZED DISNEY MOBILE SERVICE DEALERS

Authorized Disney Mobile Service Dealers are set forth on **Exhibit A** hereto.  Disney Mobile, in its sole discretion may add or remove entities from such **Exhibit A** on two day business notice to Equipment Dealer.  In the event an Authorized Disney Mobile Service Dealer is removed from **Exhibit A**, Equipment Dealer shall immediately cease offering Equipment to any such Authorized Disney Mobile Service Dealer.

## 7.    QUALITY CONTROL

Disney Mobile shall provide to Equipment Dealer the Disney Mobile policies and procedures regarding Equipment (the **"Disney Mobile SOP"**).  Equipment Dealer will comply with such written policies and procedures.  Disney Mobile may from time to time modify these policies and procedures by giving written notice to Equipment Dealer, provided that such changes do not materially expand the obligations of Equipment Dealer.

## 8.    PRICES AND TAXES

8.1    Taxes.  Disney Mobile's prices do not include sales, use, excise, or similar taxes or fees.  The amount of any valid present or future sales, use, excise, or other similar tax that is attributable to Equipment Dealer will be paid by Equipment Dealer.  If Disney Mobile is required to pay such taxes Equipment Dealer will reimburse Disney Mobile for such taxes or fees.  Upon request, Equipment Dealer will provide Disney Mobile with a tax exemption certificate acceptable to the taxing authorities.

8.2    Price Reduction Notice.  Disney Mobile shall give written notice to Equipment Dealer of any reduction in the suggested retail price of Handsets at least thirty (30) days prior to the effective date thereof.  A price reduction will apply to all ordered (under accepted Purchase Orders) but not delivered Handsets.

8.3    Price Increase Notice.  Except as otherwise agreed, Disney Mobile will give Equipment Dealer sixty (60) days' prior written notice to Equipment Dealer of the effective date of any price increases for Equipment offered by Disney Mobile.  A price increase will not affect Equipment Dealer's cost on a Purchase Order accepted by Disney Mobile prior to the effective date of such price increase.

## 9.    PURCHASE ORDERS; INVOICES; PAYMENT TERMS

9.1    Forecasts.  Upon Disney Mobile's request, Equipment Dealer will provide a rolling three month forecast (i.e., a revised 3-month forecast at the end of each month) providing a good faith estimate of the quantity and type of Handsets to be ordered (the **"Forecast"**).

9.2    Purchase Orders; 30-day Delivery Dates.  Equipment Dealer shall order Handsets via a purchase order (each, a **"Purchase Order"**) setting forth the type and quantity of Handsets desired, and a requested delivery date (at least thirty (30) days in advance).  Provided Disney Mobile (or the Designated Supplier) notifies Equipment Dealer of any anticipated delays or changes in the Handsets to be shipped to Equipment Dealer, Disney Mobile shall not be responsible for, or have any liability or penalties with respect to, such delays or changes in Handsets to be shipped.  Disney Mobile will notify Equipment Dealer of Disney Mobile's acceptance of a Purchase Order via electronic exchange (e.g., EDI or email), paper or via such other means as the parties may mutually agree upon.  Disney Mobile will be deemed to have rejected a Purchase Order if Disney Mobile fails to notify Equipment Dealer in writing of acceptance.  Equipment Dealer may not cancel a Purchase Order after 5 days have elapsed since the date the order was placed.  The Purchase Order will serve only to notify Disney Mobile of the quantity, price and delivery date for Handsets and will not contain any terms that purport to change, alter or supplement the terms hereof.  Any such terms, if included in a Purchase Order, invoice or other similar document are hereby rejected by each party.

9.3    Equipment Portfolio; Stock.  The parties will discuss in good faith the portfolio of Handsets and Accessories to be maintained in Equipment Dealer's inventory keeping in mind the goal to promote the range of Handsets and Accessories commensurate with a positive consumer experience.  Equipment Dealer shall use commercially reasonable efforts to not permit any Authorized Disney Mobile Service Dealers to be out of stock of any Equipment, unless the subject Equipment is unavailable from the Designated Supplier.

9.4    Invoice.  Upon delivery of Equipment, Disney Mobile may submit to Equipment Dealer its written invoice for such Equipment, which shall automatically incorporate, to the extent applicable, the terms and conditions of this Agreement.

9.5    Payment Terms.  Equipment Dealer shall pay each proper invoice within sixty (60) days after its receipt of that invoice.  All payments will be made in cash or cash equivalent funds in US Dollars.  Equipment Dealer may make payment by electronic fund transfer to Disney Mobile.  Past due balances will be subject to interest charges of one and one half  percent (1.5%) per month until the past due amount is paid in full.

## 10.    EQUIPMENT

10.1   <u>Authorized Equipment Only</u>.  Equipment Dealer may not sell any handset for use with Services to Authorized Disney Mobile Service Dealers (other than Handsets approved in advance by Disney Mobile).  Equipment Dealer shall not encourage or assist any Authorized Disney Mobile Service Dealer to offer to Customers any equipment or devices for use with the Service other than approved Equipment.

(a)   <u>*Handsets.*</u>   This Agreement does not otherwise restrict Equipment Dealer from selling other mobile equipment for use with wireless services offered by other wireless carriers.

(b)   <u>*Accessories.*</u>  Equipment Dealer may purchase accessories (other than the Accessories sold by the Designated Supplier) (such third party accessories, the **"Separate Accessories"**) provided that Equipment Dealer shall not use any intellectual property (e.g., trademark or copyright) of The Walt Disney Company, Disney Mobile or its or their Affiliates in connection with such Separate Accessories (including without limitation, product labeling, packaging, advertising, promoting, making claims of compatibility) without separate written approval from Disney Mobile.  Failure to approve shall be deemed a disapproval and use of any disapproved intellectual property shall constitute an infringement of the applicable Affiliate's intellectual property rights.

10.2   <u>Sale of Equipment to Equipment Dealer</u>.  The Designated Suppliers will be the sole source of all Equipment. Equipment Dealer must not purchase Equipment from any other source without the prior written permission of Disney Mobile.  At Disney Mobile's sole discretion, some types of approved Equipment may be limited or withheld from sale to Equipment Dealer.  All Equipment purchased from Disney Mobile must ultimately be sold by Equipment Dealer to an Authorized Disney Mobile Service Dealer in the original packaging with all of the components originally provided.

10.3   <u>No Reselling or Transshipping</u>.  Equipment Dealer acknowledges and agrees that Disney Mobile is selling Equipment to Equipment Dealer only for resale to Authorized Disney Mobile Service Dealers.

(a)   <u>*Reselling*</u>.  Equipment Dealer will not sell, directly or indirectly, any Equipment to Customers or resellers, wholesalers or other equipment distributors other than Authorized Disney Mobile Service Dealers.

(b)   <u>*Transshipping.*</u>  Transshipping, i.e., reselling Equipment to an unauthorized third party or reshipping Equipment to a location other than either the destination on the purchase order issued by an Authorized Disney Mobile Service Dealer, is strictly prohibited.

10.4   <u>Warranty</u>.  Disney Mobile shall provide with each Handset a warranty that includes standard protection against defects in design and manufacture, given normal use, for a period of one year from date of purchase. Disney Mobile represents and warrants that any Handset, and its accompanying labeling, packaging and instructions for use, sold to Equipment Dealer by Disney Mobile shall comply with all applicable laws and regulations in the United States.  Disney Mobile warrants that any Handset provided by Disney Mobile sold to Equipment Dealer shall, at the time of delivery, be new and free from any liens or encumbrances; provided further, Disney Mobile covenants, with respect to its Handset, not to sell Handset that are subject to a judicial or governmental order prohibiting such sale in violation of the order.  Notwithstanding anything to the contrary, the foregoing representations, warranties and covenants shall not extend to claims regarding Handset, labeling or packaging that arise as a result of abuse, misuse, modification or accident by the purchaser or user.  In the event of breach of the representations, warranties or covenants set forth in Section 10.4, Equipment Dealer agrees that its sole end exclusive remedy shall be to rely on its right to return the Handset pursuant to Section 11 and with respect to any third party claims resulting from a breach of the foregoing representations, warranties and covenants, to be indemnified pursuant to Section 15.

10.5   <u>Discontinued Equipment</u>.  Disney Mobile will provide Equipment Dealer with at least thirty (30) days written notice (the "**Discontinuance Notice**" and the expected date of discontinuation, the "**Discontinuation Date**") prior to discontinuing any Handset model (the "**Discontinued Handset**").  Following the Discontinuance Notice, Equipment Dealer may, without penalty or liability, cancel any outstanding Purchase Orders pertaining to the Discontinued Handset.

11.   **SHIPPING AND RETURNS**

11.1   <u>Shipping Terms</u>: The parties hereby agree to the ground shipment terms selected below:

<u>FOB DESTINATION, Freight Paid by Equipment Dealer</u>.  Equipment Dealer will be responsible for carrier selection and routing instructions.  Disney Mobile will pay all costs and expenses incurred prior to the FOB origin point, including without limitation, insurance, freight, and any notification, sort and segregation charges.

Title, risk of loss and responsibility for shipping and insurance pass to the Dealer upon delivery to the FOB point, or as agreed upon by the parties, such other location, which may include but is not limited to stores, and third-party fulfillment providers.

<u>Expedited Shipments; Other Charges</u>.  Equipment Dealer will pay any freight expenses incurred in connection with an expedited shipment arising from a shipment delay or other cause attributable to Equipment Dealer. Any charges related to special requests of Equipment Dealer, including loading assistance, detention, or any other instructions, prior to or after title passage, will be the responsibility of Equipment Dealer.

11.2    <u>Customer Satisfaction Period</u>.  Equipment Dealer must establish a reasonable return policy for the return of Handsets and Accessories by Customers; provided that with respect to Handsets, such return policy must be at least equal to or greater than the current Disney Mobile customer satisfaction return policy period (currently 30 days from date of purchase).  The term "**Customer Satisfaction Period**" means the minimum period required by Disney Mobile, i.e., currently 30-days, even if Equipment Dealer permits a longer period of return.

11.3    <u>Return Rights</u>.   Promptly upon the receipt of a shipment of Equipment, Equipment Dealer shall inspect the shipment for (i) patently visible shortages, defects, damages (or for shortages, defects or damages that with reasonable inspection could reasonably be expected to be discovered) and (ii) for nonconformance with the applicable Purchase Order.  Equipment Dealer may not return any Equipment which Equipment Dealer has not purchased directly from Disney Mobile.

(a)    *Defective, Damaged or Non-Conforming Equipment Prior to Distribution to Authorized Disney Mobile Service Dealers*.  Within five (5) business days of receipt of the shipment, Equipment Dealer shall notify Disney Mobile in writing of any shortages, defects, damages or nonconformance with Purchase Orders that Equipment Dealer claims existed at the time of delivery and return such Handsets via the return procedures in this Agreement.  Within ten (10) business days after the receipt of such Equipment, Disney Mobile will investigate such claims, inform Equipment Dealer of its findings, and at Disney Mobile's sole discretion either (i) deliver Equipment to Equipment Dealer to replace any which Disney Mobile determines in good faith were in short supply, defective, damaged or not conforming with Purchase Order at the time of delivery or (ii) issue Equipment Dealer a credit to reflect the cost of such Equipment (less any price protection). For a Handset to be eligible for return under this section, such Handset may not have any airtime usage.  All such returned Handsets must be new, complete with all components, have no airtime usage, undamaged, never Activated and in their original unopened packaging.

(b)    *Defective Handset at Activation.*  Within five (5) business days of receiving a Defective Handset (defined below), Equipment Dealer shall notify Disney Mobile in writing of such defects and return such Defective Handset in accordance with the return process.  Within ten (10) business days after the receipt of the Handset, Disney Mobile will investigate such claims, inform Equipment Dealer of its findings, and at Disney Mobile's sole discretion either (i) deliver Handsets to Equipment Dealer to replace any which Disney Mobile determines in good faith were Defective Handsets or (ii) issue Equipment Dealer a credit to reflect the cost of such Defective Handsets (less any price protection).  For a Defective Handset to be eligible for return under this section, such Defective Handset may not have more than 30 minutes of airtime usage.  A "**Defective Handset**" Handset means any Handset, subject to a bona fide sale to a Customer, has been in Equipment Dealer's inventory for 60 days or less, and has a defect or damage, through no fault of Equipment Dealer. Notwithstanding the foregoing, a Handset shall not be considered a Defective Handset, and shall be the sole responsibility of Equipment Dealer, if Equipment Dealer accepts a return more than thirty (30) days after such Handset was sold to Customer.

(c)    *Customer Satisfaction Returns.* Equipment Dealer may return to Disney Mobile, for a full credit, any Handsets sold by Disney Mobile which a Customer returns (to Equipment Dealer) during the Customer Satisfaction Period provided:

(i)    such return by Equipment Dealer occurs within thirty (30) days from the bona fide return by the Customer;

(ii)    the Handset is operable and returned complete with all components (e.g. handset, battery, charger, power adapter and all manuals)

(iii)    the hardware and/or software components of the Handset have not been modified, altered or reflashed by any unauthorized party.

Equipment Dealer shall receive credit from Disney Mobile, for any such return following receipt of the complete Handset.  Equipment Dealer will furnish information relating to such Handset as Disney Mobile reasonably requests to verify the timeliness of the returns, including, but not limited to, reasonable proof of purchase.  Equipment Dealer shall not receive credit for Handsets which would not otherwise qualify for return under the Customer Satisfaction Period (applicable at the time the Handset was sold).  Equipment Dealer agrees to take reasonable care in preparing returns for shipment.  Improperly packaged material, or Handsets damaged during shipment, will only be accepted for return at the discretion of Disney Mobile.  Disney Mobile may reject any returns that are damaged during shipment or by improper packaging prior to shipment.

(d)  *Infringement.*  Equipment Dealer may return any unsold, new Handset that a third party credibly claims (i.e., files a claim in court) infringes such third party's copyright, patent or trademark.

(e)  *No Repairs.*  Unless otherwise agreed in writing by Disney Mobile or under a separate arrangement direct with a manufacturer (provided Equipment Dealer has first notified Disney Mobile of such arrangement), Equipment Dealer is not authorized to repair any Handset, accept any Handset for repair or modify/alter/upgrade any hardware and/or software component of a Handset.  Equipment Dealer shall permit Customers to return Handsets during the Customer Satisfaction Period directly to Equipment Dealer.  After the Customer Satisfaction Period, the Customer is responsible for arranging repairs, whether covered by warranty, in accordance with the procedure set forth in the warranty accompanying the Handset.

11.4  Return Procedures.

(a)  *Return Authorization.*  Equipment Dealer shall request a return authorization (an **"Disney Mobile Return Authorization"**) prior to the return of any Equipment.  Disney Mobile will provide a unique return authorization number (the **"Return Authorization Number"**) to Equipment Dealer within three (3) business days of Equipment Dealer's request.  Equipment Dealer may only return Equipment that is permitted to be returned hereunder.  Equipment Dealer must return such Equipment in original, undamaged containers.  Equipment Dealer agrees to return Handsets complete with all accompanying items (e.g., battery, charger, earbud, etc.).  Disney Mobile may reduce the credit for incomplete kits.

(b)  *UPC Code.*  Disney Mobile will not accept any Handset for return if Equipment Dealer or any Authorized Disney Mobile Service Dealer removed the UPC code from the original, undamaged container.

(c)  *Return Goods Memo.*  Upon shipment of the returned Equipment to Disney Mobile, Equipment Dealer will send a debit memo (the **"Return Goods Memo"**) to Disney Mobile referencing the corresponding (i) Return Authorization Number, (ii) the ESN number, and (iii) the quantity and dollar amounts on a per unit basis.  Disney Mobile agrees to send a credit memo to Equipment Dealer within ninety (90) days of the later of the date Equipment Dealer's Return Goods Memo is received or the date the returned Equipment is received.  The credit memo will equal the amount in the Return Goods Memo except and unless Disney Mobile determines Equipment is not properly returnable.  (For example, Disney Mobile may reduce the credit for incomplete Handset returns).  If Disney Mobile receives Equipment from Equipment Dealer that Disney Mobile believes is non-returnable (or Equipment Dealer elects to have its incomplete Handsets returned), Disney Mobile will return such Equipment to Equipment Dealer's originating location within ninety (90) days of Disney Mobile's determination. Disney Mobile's return shipment to Equipment Dealer will reference the original Return Authorization Number or Return Goods Memo number; provided further, Equipment Dealer will reimburse Disney Mobile for any shipping, insurance and handling expenses incurred in connection with such return delivery.

(d)  *Changes.*  Disney Mobile reserves the right to change these return policies upon reasonable prior written notice to Equipment Dealer.

11.5  Equipment Storage.  Equipment Dealer must store properly and safely all Equipment in its possession.

11.6  Sole Remedies.  The remedies set forth in this Section regarding returns, warranties and defective Equipment are Equipment Dealer's sole and exclusive remedies for such returns, warranties and defective Equipment.

## 12.  TRADENAMES AND TRADEMARKS

12.1  Marks.  Disney Mobile grants no license hereunder to Equipment Dealer.

12.2  General -- No Use of Marks.  Without limiting the foregoing, Equipment Dealer shall acquire no right to use, and shall not use, the names "Disney Mobile", "Disney", "ABC", "ESPN", "Mobile ESPN" (either alone or in

conjunction with or as a part of any other word or name) or any fanciful characters, other marks or designs of The Walt Disney Company or any of its subsidiaries, affiliated or related companies: (i) in any advertising, publicity, promotion; (ii) to express or to imply any endorsement of Equipment Dealer; nor (iii) in any other manner, except as authorized in this Agreement.

12.3   Reservation of Rights.  All rights not expressly granted hereunder are reserved to Disney Mobile.

## 13.   CONFIDENTIALITY

13.1   Neither party shall publish, reproduce, circulate or otherwise distribute or disclose any oral, written, graphic or machine-readable information provided by the other party, including, but not limited to, the terms of this Agreement, information which relates to forecasts, sales, results, status of third party relationships, the Agreement, prices, general business, financial or technical information, Equipment, Services, Authorized Disney Mobile Service Dealers, current or prospective Customers, any other terms, material or communication related to this Agreement or any material or information furnished to it by the other party which is marked "confidential" or otherwise marked to indicate its proprietary nature or which under the circumstances surrounding disclosure, the receiving party ought to reasonably understand such information to be confidential (collectively **"Confidential Information"**).  All data with respect to Purchase Orders or that is generated as the result of Customer orders is Confidential Information of Disney Mobile or its Affiliates.

13.2   Each party's Confidential Information shall only be used by the other party in its performance hereunder, and it shall not be disclosed by such other party, except to those employees or agents of such other party who have a need to know and an obligation to comply with the terms of this clause, or with respect to Disney Mobile, to an Affiliate.  Each party agrees that it shall take all reasonable measures to protect the secrecy of and avoid disclosure or use of confidential information of the other party in order to prevent it from falling into the public domain or the possession of persons other than those persons authorized under this Agreement to have any such information.  Such measures shall include, but not be limited to, the highest degree of care that the receiving party utilizes to protect its own confidential information of a similar nature, which shall be no less than reasonable care.  Each party further agrees to promptly notify the disclosing party in writing of any actual or suspected misuse, misappropriation or unauthorized disclosure of the other party's Confidential Information which may come to the receiving party's attention.

13.3   Notwithstanding the foregoing, either party may disclose information concerning this Agreement and the transactions contemplated hereby, including providing a copy of this Agreement to: a party's professional advisors in connection with accounting or tax audits, legal advice, risk management or related matters, in all cases subject to the confidentiality restrictions of this Agreement. If any of the following apply to any information, such information shall not be considered as a party's Confidential Information: (i) it is or becomes available to the public through no breach of this Agreement or wrongful act of a party; (ii) it is already in the possession of each party and not subject to any agreement of confidence between the parties as evidenced by contemporaneous written documentation; (iii) it is received from a third party not under a duty of confidentiality to the other party; or (iv) it is independently developed by a party without reference to the other party's Confidential Information.  Each party may disclose the other party's Confidential Information pursuant to a requirement of a duly empowered government agency or a court of competent jurisdiction or otherwise as may be required by law after notice and a reasonable opportunity to intervene, as permitted by the circumstances, are given to the party whose Confidential Information is subject to disclosure.  Upon termination or expiration of this Agreement, each party shall destroy or return all of the other party's Confidential Information and so certify in writing at such other party's direction.

13.4   The obligations of this provision will survive for the earlier to occur of (a) one (1) year following disclosure of the Confidential Information, or (b) one (1) year following the termination of this Agreement, except with respect to personal information of Customers which shall survive termination or expiration.

## 14.   CARDHOLDER ASSOCIATION STANDARDS

Equipment Dealer shall not accept or represent that it accepts credit, charge and/or debit card payments on behalf of Disney Mobile. Equipment Dealer shall not transmit cardholder information on behalf of Disney Mobile.

## 15.   INDEMNIFICATION

15.1   **Disney Mobile Indemnification.**  Disney Mobile will indemnify, defend and hold harmless Equipment Dealer, and its Affiliates, including, but not limited to, and its or their officers, employees, directors, agents,

successors and assigns (the **"Vendor Indemnitees"**), against any and all damages, losses, liabilities, judgments, costs and expenses (including reasonable attorneys' fees), which the Vendor Indemnitees pay to unrelated third parties with respect to claims by such third parties based on (i) Disney Mobile's material breach of its respective representations, warranties, obligations or agreements set forth in this Agreement, (ii) the negligent acts or omissions or willful misconduct of any person or entity providing services to Equipment Dealer on behalf of Disney Mobile such as subcontractors, (iii) Disney Mobile's or its respective officers', directors', invitees' or employees' negligent acts or omissions or willful misconduct, including without limitation, claims for personal injury and property damage, (iv) the infringement or misappropriation of any patent, copyright, trademark or other intellectual property right or proprietary right by Disney Mobile, provided, however, Disney Mobile will have no liability for claims of infringement to the extent they arise from the Vendor Indemnitee's combination, operation or use of software or any portion of Disney Mobile-provided software with software or hardware not provided or required to be used by Disney Mobile, (v) any actions taken by Equipment Dealer regarding the Equipment at the specific written request of, and consistent with, specific written instructions provided by Disney Mobile where there was no reasonable way that Equipment Dealer could achieve the objectives of such instructions and avoid the claim or Equipment Dealer informed Disney Mobile in writing that it could not follow such instructions and without risking the harm that occurred and Disney Mobile instructed Equipment Dealer in writing to take the action anyway, (vi) defects to the extent covered by a warranty hereunder, excluding claims resulting from (A) Equipment Dealer's improper performance of its obligations hereunder or from Equipment Dealer's actions or omissions not specifically authorized by Disney Mobile , (B) damage to the Equipment caused by Equipment Dealer or (C) Equipment Dealer's alteration of the Equipment not specifically requested by Disney Mobile , and (vii) any occupational injury or illness sustained by an employee or agent of Disney Mobile in furtherance of its obligations hereunder.

15.2     **Equipment Dealer Indemnification.**  Equipment Dealer will indemnify defend and hold harmless Disney Mobile and its Affiliates including, but not limited to, its or their officers, employees, directors, agents, successors and assigns (the **"Disney Mobile Indemnitees"**), against any and all damages, losses, liabilities, judgments, costs and expenses (including reasonable attorneys' fees), which the Disney Mobile Indemnitees pay to unrelated third parties with respect to claims by such third parties based on (i) Equipment Dealer's material breach of its representations, warranties, obligations or agreements set forth in this Agreement, (ii) the negligent acts or omissions or willful misconduct of any person or entity providing services for Disney Mobile on behalf of Equipment Dealer, such as subcontractors, unless such subcontractor was selected by Disney Mobile, (iii) Equipment Dealer's or its officers', directors', invitees' or employees' negligent acts or omissions or willful misconduct, including without limitation, claims for personal injury and property damage, (iv) the infringement or misappropriation of any patent, copyright, trademark or other intellectual property right or proprietary right by Equipment Dealer (or any person or entity providing services for Disney Mobile on behalf of Equipment Dealer, provided, however, Equipment Dealer will have no liability for claims of infringement to the extent they arise from the combination, operation or use of Equipment Dealer-provided software or any portion of such software with software or hardware not provided or required to be used by Equipment Dealer, (v) an act or omission by Equipment Dealer, other than acts or omissions prescribed by Disney Mobile pursuant to this Agreement of Disney Mobile's policies and procedures, which a court of competent jurisdiction holds has created a franchise relationship between Equipment Dealer and Disney Mobile, and (vi) defects or other Equipment or product liability claims resulting from (A) Equipment Dealer's improper performance of its obligations hereunder or from Equipment Dealer's acts or omissions not specifically authorized by Disney Mobile, (B) damage to the Equipment caused by Equipment Dealer or (C) Equipment Dealer's alteration of the Equipment not specifically requested Disney Mobile , or (vi) any occupational injury or illness sustained by an employee or agent of Disney Mobile in furtherance of its obligations hereunder.

15.3     **Conditions.**  The indemnified party covenants to (i) give the indemnifying party notice of the relevant claim as soon as practicable, but in all events, within a period of time that will not prejudice the rights of the indemnifying party, (ii) cooperate with the indemnifying party, at the indemnifying party's expense, in the defense of such claim, and (iii) give the indemnifying party the right to select counsel (subject to the indemnified party's approval which shall not be unreasonably delayed or withheld), control the defense and settlement of any such claim, except that the indemnifying party (or the indemnified party if it overtakes the defense as per this Section) will not enter into any settlement without the indemnified party's prior written approval which shall not be unreasonably withheld. The indemnified party will have the right to participate in the defense at its expense.  If the indemnifying party does not commence the defense or settlement of the indemnifiable claim after notice from the party to be indemnified, or ceases to prosecute the defense of or pursue settlement of such claim, then the party to be indemnified may engage counsel of its choosing and defend or settle the indemnifiable claim at the indemnifying party's cost, and all such costs of defense or settlement shall be reimbursed by the indemnifying party as such costs are incurred.

**16.     INSURANCE**

16.1     Between the Parties.  Disney Mobile, on the one hand, and Equipment Dealer on the other shall provide and maintain at its own expense the following insurance against liability arising in any way out of this Agreement: (i) Commercial General Liability Insurance to include contractual liability, public liability, personal injury, property damage, operations liability, and cross liability (which must be maintained for three years following expiration or termination of this Agreement) with minimum limit of $2,000,000 written on an occurrence form basis; (ii) Worker's Compensation Insurance as required by applicable law, and Employer's Liability insurance with minimum limits of $1,000,000.  Such policy or policies shall (i) cover acts of its employees, (ii) name the other party as an additional insured, (iii) be procured from an insurance carrier reasonably acceptable to the other party (it being acknowledged by Equipment Dealer that the insurance carrier affiliated with The Walt Disney Company is acceptable) and (iv) contain a waiver of subrogation clause whereby the insurer waives all rights of subrogation it may have under such policies as related to the other party.  Within ten (10) days of execution of this Agreement, each party shall furnish the other party with a certificate evidencing such insurance.  Such insurance shall provide that the insurer will not cancel, materially alter, or allow such insurance to expire without first giving the other party thirty (30) days' prior written notice.  Each party will promptly provide the other party with written notice thereof and make available to the other party all information and documentation relating thereto.

## 17.   TERMINATION

17.1     Termination For Convenience.  Disney Mobile may terminate this Agreement or revoke Equipment Dealer's right to sell Equipment to any Authorized Disney Mobile Service Dealer for any reason or no reason, upon five (5) days' prior written notice.  Equipment Dealer may terminate this Agreement for any reason or no reason upon ninety (90) days' prior written notice (not to be provided earlier than the six month anniversary of the Effective Date).

17.2     Termination for Material Breach.  Disney Mobile may terminate this Agreement immediately upon written notice to Equipment Dealer if Equipment Dealer fails to cure a breach of its obligations hereunder within thirty (30) days of the delivery of written notice, except with respect (i) to a breach of a similar nature to a previously cured breach, for which the cure period is ten (10) days, (ii) to a breach of confidentiality obligations or the intellectual property license for which the cure period is ten (10) days, or (iii) to a failure to pay an undisputed payment, for which the cure period is ten (10) days.

17.3     Termination for Cessation of Business or Bankruptcy.  Either party may terminate this Agreement if it plans to exit its then current business by providing thirty (30) days' prior written notice; provided that the terminating party in fact does so exit the business within a reasonable period time (e.g., 30-90 days).  Regardless, this Agreement will automatically terminate one day following the date either Party ceases to do business, elects to dissolve, declares insolvency, has a receiver appointed, makes a general assignment for the benefit of creditors, or files (voluntarily or involuntarily) any petition in bankruptcy or for relief under the provisions of the bankruptcy laws.

17.4     Minimum Purchase Requirements.  N/A.

17.5     Effect of Termination – Equipment Sales.

(a)     Return Criteria.  Upon termination for any reason or no reason or expiration of the Term, and again upon termination (for any reason or no reason or expiration of the Sell-Off Period (as defined below), if any), Disney Mobile may, in its sole discretion offer to repurchase any or all Handsets in Equipment Dealer's inventory that are (i) in original packaging, unopened and undamaged, (ii) complete with all components in a new unused/unaltered condition (e.g. handset, handset software, battery, charger, power adapter and all manuals) and (iii) purchased by Equipment Dealer within thirty (30) days of the effective date of termination or expiration (collectively the **"Return Criteria"**), a price equal to the amount paid by Equipment Dealer, and, in such event, Equipment Dealer shall resell such Handsets to Disney Mobile at such price.  Disney Mobile shall pay for shipping and insurance, unless this Agreement is terminated due to Equipment Dealer's breach, in which event Equipment Dealer shall be responsible for shipping and insurance.  Except for termination by Disney Mobile pursuant to Section 17.1, all returned Handsets are subject to a restocking fee of $20 per Handset.

(b)     Sell-Off Period.  The parties may mutually agree upon a period during which Equipment Dealer may sell-off remaining Equipment through Authorized Disney Mobile Service Dealers in the ordinary course (the **"Sell-Off Period"**).  A party is not required to offer or to agree to such a period, and such period may be conditioned on factors to be agreed upon.

(c)     Inventory Disposal.  Without limiting any other provision of this Agreement with respect post-termination sales, Equipment Dealer shall not sell any Equipment unless Equipment Dealer has offered such Equipment to Disney Mobile for repurchase at the lesser of (i) the price Equipment Dealer paid less any price protection given and less any restocking fee, or (ii) the price for which Equipment Dealer is offering the Equipment.  If Equipment Dealer has any Equipment in its inventory at the end of the Term (or Sell-off Period,

if later) that Disney Mobile does not repurchase, then Equipment Dealer shall only sell such Equipment to a third party in the ordinary course of business, but only in the U.S. and not knowingly to any party who intends to export such product outside the U.S.

17.6     Effect of Termination -- Other.  Upon any termination or expiration of the Term (or Sell-Off Period, if any), all licenses hereunder shall terminate, including without limitation, use of trademarks, copyrights or Disney Mobile Content (and breaches thereof shall give rise to an infringement claim, without limiting any other remedies hereunder).  Equipment Dealer shall cease identifying itself as an independent representative or authorized Equipment Dealer of Equipment, and shall return or provide to Disney Mobile lists of Authorized Disney Mobile Service Dealers, books, records and other information supplied to, developed or maintained by Equipment Dealer pertaining to Authorized Disney Mobile Service Dealers; and all other written information and materials supplied to it by Disney Mobile pursuant to this Agreement or which contain Disney Mobile's intellectual property.  Equipment Dealer shall cease supplying Authorized Disney Mobile Service Dealers with, and cause Authorized Disney Mobile Service Dealers to cease selling, Equipment.

17.7     Survival.  The sections which by their terms would reasonably be expected to survive termination or expiration, including confidentiality, indemnity and audit sections, shall so survive any such termination or expiration

## 18.     NOTICES

18.1     Except as otherwise provided in this Agreement, all notices and approvals to be given hereunder shall be in writing and shall be delivered (a) personally; (b) by certified mail, return receipt requested; (c) by an overnight courier service having a record of receipt; or (d) by facsimile, with a confirming copy sent by one of the other three methods described in this sentence.  Notices shall be addressed as follows:

If to Equipment Dealer:

To the address set forth atop this Agreement.

With copy to:

If to Disney Mobile:

WDIG Mobile LLC
500 South Buena Vista Street
Burbank, CA 91521
ATTN:  General Manager Disney Mobile
Phone:   (818) 623-3200
Fax:       (818) 623-3939

With a copy to:

WDIG Mobile LLC
500 South Buena Vista Street
Burbank, CA 91521
ATTN:  General Counsel
Phone:  (818) 623- 3200
Fax:       (818) 623- 3552

18.2     Either party hereto may change its address by a notice given to the other party hereto in the manner set forth above.  All notices shall be effective on receipt.  EQUIPMENT DEALER AGREES THAT NOTICE VIA E-MAIL TO A DESIGNATED PERSON SHALL BE SUFFICIENT FOR THE ANNOUNCEMENT OF PRICE REDUCTIONS.

## 19.     DISPUTES

19.1     Governing Law; Venue; Consent to Personal Jurisdiction.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without reference to New York choice of law rules.  Any civil action based upon, arising out of, or in any manner connected with this Agreement, its breach, or any of the transactions contemplated by this Agreement shall be commenced in and determined by one of the federal or state courts in the Borough of Manhattan, New York, New York.  Each of the Parties to this Agreement (a) irrevocably and unconditionally consents and submits to the in personal jurisdiction of such courts in any such action, (b) consents to service of process in accordance with the rules governing proceedings in any such court, and (c) irrevocably waives and

covenants not to assert any objection to the laying of venue in any such court in any such action.  Notwithstanding the foregoing, either Party shall have the right to seek enforcement of its intellectual property rights in any jurisdiction.

19.2    Arbitration.

(a)    The parties agree that any and all unresolved civil disputes or civil controversies of any nature between them arising at any time shall be determined by binding arbitration in accordance with the Commercial Arbitration Rules (with Appeal option) of the Judicial Arbitration and Mediation Service (**"JAMS"**) before one (1) arbitrator appointed in accordance with such rules; provided that, if the parties cannot agree on one (1) arbitrator, the arbitration shall be conducted before three (3) arbitrators with each party choosing one arbitrator and the two arbitrators chosen by the parties choosing the third arbitrator.  The parties shall be entitled to conduct discovery as determined by the arbitrator(s), provided that (a) the arbitrator must authorize such all discovery in advance based on findings that the material sought is relevant to the issues in dispute and that the nature and scope of such discovery is reasonable under the circumstances, and (b) discovery shall be limited to depositions and production of documents unless the arbitrator(s) find(s) that another method of discovery (e.g., interrogatories) is the most  reasonable and cost efficient method of obtaining the information sought.  There shall be a record of the proceedings at the arbitration hearing and the arbitrators shall issue a Statement of Decision setting forth the factual and legal basis for the arbitrator(s)'s decision.

(b)    If neither party gives written notice requesting an appeal within thirty (30) days after the issuance of the Statement of Decision, the arbitrator(s)'s decision shall be final and binding as to all matters of substance and procedure, and may be enforced by a petition to a court of competent jurisdiction, which may be made ex parte, for confirmation and enforcement of the award.  If neither party gives written notice requesting an appeal within thirty (30) days after the issuance of the Statement of Decision, the award of the arbitrator(s) shall be appealed to three (3) neutral arbitrators (the "Appellate Arbitrators"), each of whom shall have the same qualifications and be selected through the same procedure as the initial arbitrator(s).  The Appellate Arbitrators shall in all cases issue a final award and shall not remand the matter to the initial arbitrator(s).  The decision of the Appellate Arbitrators shall be final and binding as to all matters of substance and procedure, and may be enforced by a petition to a court of competent jurisdiction, which may be made ex parte, for confirmation and enforcement of the award.

(c)    The costs of any arbitration, including administrative fees and fees of the arbitrator(s), shall be shared equally by the parties.  Each party shall bear the cost of its own attorneys' fees and expert fees; provided that, the prevailing party shall be entitled to collect its attorneys' fees and expenses from the other party.

(d)    Notwithstanding any provision of applicable law, the parties will not request, and the arbitrator(s) shall have no authority to award, punitive or exemplary damages against any party.  The parties and the arbitrator(s) shall use their best efforts to complete any such arbitration within one (1) year after the appointment of the arbitrator(s), unless a party can demonstrate to the arbitrator(s) that the complexity of the issues or other reasons warrant the extension of the timetable. In such case, the arbitrator(s) may extend such timetable as reasonably required.  The arbitration shall take place in New York, New York (Manhattan) and the arbitrator(s) shall, in rendering its decision, apply the substantive law of the State of New York, without giving effect to its choice of law principles.  A party to the arbitration may go to a court of competent jurisdiction for relief solely in aid of or to enforce an award from the arbitration, as provided by applicable law.

19.3    Attorneys' Fees.  In the event an action is commenced by either party to enforce the terms of this Agreement, the substantially prevailing party in such action shall be entitled to its reasonable costs and attorneys' and expert witness' fees incurred therein through appeal.

19.4    DISCLAIMER OF CONSEQUENTIAL DAMAGES.  EXCEPT AS SET FORTH IN SECTION 19.6 BELOW, NEITHER EQUIPMENT DEALER NOR DISNEY MOBILE WILL BE LIABLE FOR INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, LOSS OF PROFITS, LOSS OF DATA, COST OF CAPITAL, FACILITIES OR SERVICES, DOWNTIME COST OR ANY CLAIM AGAINST EQUIPMENT DEALER OR DISNEY MOBILE BY ANY OTHER PARTY.  THE PARTIES HAVE ACCEPTED THE DISCLAIMER OF LIABILITY AS PART OF A BARGAIN OVER THE PRICE OF THE SERVICES AND UNDERSTAND THAT THE PRICE OF THE SERVICES WOULD BE DIFFERENT IF EITHER PARTY WERE REQUIRED TO BEAR ADDITIONAL LIABILITY.  THIS DISCLAIMER OF LIABILITY WILL NOT BE AFFECTED IF ANY REMEDY PROVIDED HEREIN FAILS OF ITS ESSENTIAL PURPOSE.

19.5    LIMITATION OF LIABILITY.  EXCEPT AS SET FORTH IN SECTION 19.6 BELOW, THE AGGREGATE LIABILITY OF DISNEY MOBILE ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE

SERVICE AGREEMENT, WHETHER FOR BREACH OF CONTRACT, OR WARRANTY, NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE, IS TWO TIMES THE TOTAL OF (i) AMOUNTS PAID BY EQUIPMENT DEALER TO DISNEY MOBILE, PLUS (II) AMOUNTS PAID BY DISNEY MOBILE TO EQUIPMENT DEALER, BY DURING THE PRECEDING 12 MONTH PERIOD.

19.6    LIMITATION CARVEOUT. THE LIMITATIONS SET FORTH IN SECTIONS 19.4 AND 19.5 ABOVE WILL NOT APPLY TO (I) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS FOR PAYMENTS TO THIRD PARTIES, (II) EITHER PARTY'S LIABILITY ARISING OUT OF, RELATING TO OR RESULTING FROM A BREACH OF SECTION ARTICLE IX (CONFIDENTIALITY), (III) A PARTY'S MISAPPROPRIATION OR INFRINGEMENT OF THE OTHER PARTY'S INTELLECTUAL PROPERTY RIGHTS, (IV) DAMAGES ATTRIBUTABLE TO INTENTIONAL TORTS, WILLFUL MISCONDUCT OR GROSS NEGLIGENCE MASTER, OR (V) EQUIPMENT DEALER'S IMPLEMENTATION OF A WORK STOPPAGE OTHER THAN A WORK STOPPAGE AUTHORIZED UNDER SECTION 19.7.

19.7    No Work Stoppage. In the event of an Event of Default or other material breach for which Equipment Dealer alleges, in good faith, a termination right, but for which Disney Mobile contests in writing Equipment Dealer's right to terminate, all parties agree to continue performing their obligations hereunder until the earlier of (i) the date a court of competent jurisdiction finally determines that such Event of Default or material breach exists and (ii) the date 90 days following Notice of the Event of Default (such period, the **"Performance Period"**). If Disney Mobile desires Equipment Dealer not to terminate this Agreement as per the terms hereunder, then Disney Mobile shall notify Equipment Dealer within thirty (30) days of the Notice of the Event of Default and shall place in escrow an amount equal to one-half of the amount in bona fide dispute. The interest from the escrow account shall belong to Disney Mobile. At the end of the Performance Period, if the parties have not resolved the dispute then Disney Mobile shall release to Equipment Dealer the escrowed amount; provided however, such release shall not preclude either party from seeking additional rights or remedies, including Equipment Dealer seeking the other half of the disputed amount or Disney Mobile seeking a return of the escrowed amount.

## 20.    RECORDS, AUDITS AND REPORTS

20.1    Records. Equipment Dealer shall maintain, during the term of this Agreement and for a period of twenty-four (24) months from the date of expiration or termination of this Agreement: (i) financial records relating to the Agreement in accordance with generally accepted accounting principles applied on a consistent basis, (ii) records substantiating Equipment Dealer's reports and (iii) such other operational records pertaining to their performance as Equipment Dealer keeps in the ordinary course of its business. Disney Mobile shall maintain complete and accurate records of all transactions, including delivery and accounting records for all Equipment or other materials delivered to Equipment Dealer and any compensation, credits or other amounts paid or to be paid or issued under this Agreement as are reasonably necessary for reconciliation, during the term of this Agreement and for a period of twenty-four (24) months from the date of expiration or termination of this Agreement.

20.2    Inspections and Audits. Equipment Dealer shall grant Disney Mobile the right, at its own expense, to inspect and audit, or direct an independent certified public accounting firm agreeable to Equipment Dealer to inspect and audit, all of its transaction records related to this Agreement that pertains to the particular party seeking the inspection and audit; provided, that: (a) Disney Mobile shall provide reasonable advance written notice prior to such inspection and audit; and (b) any such inspection and audit shall be conducted during regular business hours in such a manner as not to interfere with normal business activities. Disney Mobile shall bear the audit expenses, unless the audit reveals an overpayment in excess of five percent (5%), in which such instance Equipment Dealer shall promptly reimburse Disney Mobile for the reasonable cost of such audit. Disney Mobile and their respective auditors will comply with Equipment Dealer's reasonable security and confidentiality requirements when accessing facilities or other resources owned or controlled by Equipment Dealer.

20.3    Offsets. Only Disney Mobile may offset amounts due hereunder, if any, with amounts owed to Disney Mobile (or its Affiliates) by Equipment Dealer (or its Affiliates) pursuant to this or any other agreement between the parties (or their Affiliates).

20.4    Authorized Disney Mobile Service Dealers. Equipment Dealer shall require, by written agreement, that any Authorized Disney Mobile Service Dealer bring (and waive rights to the contrary) all disputes, including without limitation, disputes regarding payment or inventory, directly against Equipment Dealer, and not against Disney Mobile or its Affiliates. Disney Mobile shall be a third party beneficiary of the Equipment Dealer's agreements with such persons or entities and may pursue claims directly against such persons or entities without first exhausting its rights against Equipment Dealer. Equipment Dealer shall cooperate with any such claim.

21.    **MISCELLANEOUS**

21.1    Third Party Beneficiary. Equipment Dealer shall require, by written agreement, that any Authorized Disney Mobile Service Dealer bring (and waive rights to the contrary) all disputes, including without limitation, disputes regarding payment or inventory, directly against Equipment Dealer, and not against Disney Mobile or its Affiliates. Disney Mobile shall be a third party beneficiary of its Equipment Dealer's agreements with such persons or entities and may pursue claims directly against such persons or entities without first exhausting its rights against Equipment Dealer. Equipment Dealer shall cooperate with any such claim.

21.2    Ethical Responsibilities; No Conflicts; Code of Conduct. Each party represents and warrants that it will at all times (i) be governed by the highest standards of honesty, integrity and fair dealing; (ii) comply in all material respects with all applicable laws, rules, regulations and orders; and (iii) not enter into any conflicting agreements with third parties.

21.3    No Agency. Neither (i) Equipment Dealer (with respect to Disney Mobile) or (ii) Disney Mobile (with respect to Equipment Dealer) are authorized to act as an agent for, or legal representative of, the other party(ies), nor shall any such party have authority to assume or create any obligation on behalf of, in the name of, or that shall be binding upon, the other party(ies). Each party has the sole responsibility for directing its own day-to-day business operations and will pay its own business expenses. Each party will conduct its business for its own interest and all persons employed in the conduct of its business will be its employees or agents. Each party is solely responsible for the withholding or payment of all federal, state, and local taxes, social security, unemployment, sickness, disability, and worker's compensation insurance and other payroll taxes with respect to its business. Neither such party nor any of its employees are entitled to any employee benefits from the other party(ies) or its or their Affiliates.

21.4    Assignment. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. This Agreement and Equipment Dealer's rights and obligations hereunder are personal to Equipment Dealer and may not be assigned or delegated by Equipment Dealer.  Disney Mobile may assign or delegate any part of its rights or obligations to any party.

21.5    Waiver.  The waiver, express or implied, by either party of any rights hereunder or of any failure to perform or breach hereof by the other party shall not constitute or be deemed a waiver of any other right hereunder or any other failure to perform or breach hereof by the other party, whether of a similar or dissimilar nature.

21.6    No Set-off.  Equipment Dealer may not, and hereby waives any right it may have at law, in equity, under contract or otherwise to, set-off or exercise any similar remedy against Disney Mobile, in whole or in part, any sum that Disney Mobile  (or its Affiliates) may from time to time owe to it.

21.7    Severability.  If an arbitral panel of competent jurisdiction (per this Agreement) holds any part of this Agreement invalid, the remaining portions of the Agreement shall continue in full force and effect, unless such holding materially alters the nature of the obligations of either party hereto.  In such event, this Agreement shall immediately terminate.

21.8    Force Majeure.  Each party's performance under this Agreement shall be excused if such non-performance is due to labor difficulties, governmental orders, equipment failure, inability or delay in securing Equipment, civil commotion, acts of nature, weather disturbances or adverse weather conditions, and other circumstances beyond the party's reasonable control; provided however, a the party not asserting a force majeure may terminate this Agreement if the other party's force majeure extends for more than ten (10) consecutive days.

21.9    Merger/Entire Agreement. With respect to the subject matter hereof, this Agreement represents the entire agreement between the parties hereto and, except as expressly provided, shall not be affected by reference to any other documents.  The attached Exhibits are a material and integral part of this Agreement.  The terms and conditions of this Agreement supersede any other agreements or understandings, including prior or contemporaneous representations of sales representatives or other Disney Mobile personnel, whether oral or written.

21.10    Amendments.  This Agreement may not be amended except in writing signed by both parties; provided however, Disney Mobile may find it prudent at times to change or update certain operational policies or procedures described in this Agreement in order to conduct its business more efficiently, and Disney Mobile may implement such good faith changes or updates by providing thirty (30) days' prior written notice to Equipment Dealer.

21.11    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall constitute an original agreement, but all of which together shall constitute one and the same instrument.

21.12    Publicity.  Neither party shall issue any media releases, public announcements or public disclosures relating to the Agreement or the subject matter of the Agreement, including pro-motional or marketing material, but not including announcements intended solely for internal distribution or disclosures to the extent required to meet legal or regulatory requirements without the other party's prior written approval. Equipment Dealer may not list Disney Mobile as a customer or describe in general terms the services provided by Equipment Dealer under the Agreement in proposals, on their website or in any other marketing materials.

21.13    Preparation of Agreement.  This Agreement shall not be construed more strongly against any party regardless of who is responsible for its preparation or drafting.

## 22.         INDEPENDENT INVESTIGATION

THE PARTIES ACKNOWLEDGE THEY HAVE READ THIS AGREEMENT AND UNDERSTAND AND ACCEPT THE TERMS, CONDITIONS, AND COVENANTS CONTAINED HEREIN.

EQUIPMENT DEALER ACKNOWLEDGES THAT DISNEY MOBILE DOES NOT REPRESENT: (a) EQUIPMENT DEALER'S PROSPECTS OR CHANCES FOR SUCCESS IN ACQUIRING AUTHORIZED DISNEY MOBILE SERVICE DEALERS FOR THE EQUIPMENT; (b) THE TOTAL INVESTMENT EQUIPMENT DEALER MAY NEED TO MAKE TO OPERATE UNDER THIS AGREEMENT (DISNEY MOBILE DOES NOT KNOW THAT AMOUNT); OR (c) THAT DISNEY MOBILE WILL LIMIT ITS EFFORTS TO ACQUIRE  EQUIPMENT DEALERS AND/OR AUTHORIZED DISNEY MOBILE SERVICE DEALERS THROUGH OTHER CHANNELS IN THE EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

EACH PARTY HAS INDEPENDENTLY INVESTIGATED THE WIRELESS SERVICE AND EQUIPMENT BUSINESS AND THE RISKS THEREOF AND IS NOT RELYING ON ANY REPRESENTATION, GUARANTEE, OR STATEMENT OF THE OTHER PARTY EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

# # #

Equipment Purchase Agreement
10-23-06

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized officers as of the day and year first above written.

WDIG Mobile, LLC                        Digital Communication Warehouse Incorporated


By: _____          By: _____
Name: George E. Grobar                  Name: DRY Shusterman
Title: Senior Vice President            Title: President

## EXHIBIT A

## AUTHORIZED DISNEY MOBILE SERVICE DEALERS

**Authorized Disney Mobile Service Dealer #1**

| Full Corporate Name | State of Incorporation | Contact Info: | |
|---|---|---|---|
| Wonders of Wireless Incorporated | PA | Address | 6190 Ridge Avenue Philadelphia , PA. 19128 |
| | | Contact Name | Irving Shusterman, President |
| | | Email | irvingshust@aol.com |
| | | Phone | 801-566-7252 |